MENY JACOBS, as President of the Protective Coat Tailors
and Pressers' Union, Local 55, of the United Garment Work-
ers of America, Appellant, *v.* MORRIS COHEN et al., Com-
prising the Firm of M. COHEN & SON, et al., Respondents.

PUBLIC POLICY — AGREEMENT BETWEEN EMPLOYERS AND LABOR
UNIONS — PROMISSORY NOTE GIVEN AS SECURITY FOR PERFORMANCE.
A contract between employers and a labor union, whereby the former
agreed for a certain period, to employ and retain only members of the union
in good standing, and the latter, for the same period, bound themselves
to furnish the services of its members, is not violative of public policy;
and a promissory note given by the employers as collateral security, to be
applied as liquidated damages for the violation of such contract, is a
valid and enforceable instrument.

*Jacobs* v. *Cohen*, 99 App. Div. 481, reversed.

(Argued October 3, 1905; decided November 28, 1905.)

APPEAL, by permission, from an order of the Appellate
Division of the Supreme Court in the second judicial depart-
ment, entered December 1, 1904, which reversed an interlocu-
tory judgment entered upon an order of Special Term
sustaining a demurrer to the answer and overruled such
demurrer.

The nature of the action, the facts, so far as material, and
the questions certified are stated in the opinion.

*E. H. M. Roehr* for appellant. The contract entered into
between the plaintiff and the defendants Morris and Louis
Cohen is valid and enforceable at law  (*Nat. P. Assn.* v.

*Cumming*, 170 N. Y. 315 ; *Mills* v. *U. S. P. Co.*, 99 App.
Div. 608 ; *Foster* v. *R. C. P. Assn.*, 39 Misc. Rep. 48.) The
contract pleaded in the defense does not contain any provision
which has for its purpose the coercing of workingmen to
become members of said employees' organization and come
under its rules and its conditions under penalty of loss of their
positions and of deprivation of employment. (*Bowen* v.
*Matheson*, 14 Allen, 499 ; *Nat. P. Assn.* v. *Cumming*, 170
N. Y. 315 ; *Mills* v. *U. S. P. Co.*, 99 App. Div. 608 ; *Foster*
. *R. C. P. Assn.*, 39 Misc. Rep. 48.)

*William Liebermann* for respondents. The contract entered
into between the plaintiffs, the defendants and all the employees,
of Morris Cohen and Louis Cohen is invalid, against public
policy and unenforceable at law. (*Curran* v. *Galen*, 152 N. Y.
33 ; *Matthew* v. *Shankland*, 56 N. Y. Supp. 123 ; 25 Misc.
Rep. 604 ; *O. B. S. Co.* v. *McKenna*, 30 Fed. Rep. 48 ;
*Casey* v. *C. T. Union*, 45 Fed. Rep. 135 ; *Nat. P. Assn.* v.
*Cumming*, 170 N. Y. 315 ; *Beattie* v. *Callanan*, 82 App.
Div. 7 ; *Park & Sons Co.* v. *Nat. W. D. Assn.*, 175 N. Y.
1 ; *Jacobs* v. *Cohen*, 99 App. Div. 481.) The face of the con-
tract shows that the contract contains provisions which have
for their purpose the coercing of workingmen to become
members of said employees' organization and come under its
rules and its conditions under penalty of loss of their positions
and of deprivation of employment. (*Curran* v. *Galen*, 152
N. Y. 33.)

GRAY, J. The plaintiff sues the makers and the indorser
 a promissory note, payable to the order of the Protective
Coat Tailors' Union, of which he is the president, to recover
the amount due thereon. The answer of the defendants
denied the allegations of the complaint, except as to the
making of the note, and set up as a distinct and separate
defense that it was given " as collateral security to the plain-
tiff, to be applied as liquidated damages, for violation by the
defendants, of any of the covenants and conditions of a cer-

tain contract." The particular part of the contract set forth is as follows: "That the party of the first part [meaning the makers' firm] shall not employ any help whatsoever other than those belonging to, and who are members of the party of the third part, [meaning a 'union' of the firm's employés] and in good standing, and who conform to the rules and regulations of the said party of the third part, and the said party of the first part shall cease to employ any one and all those employés who are not in good standing, and who do not conform to and comply with the rules and regulations of said party of the third part, upon being notified to that effect by its duly credentialed representatives. That the party of the first part shall not engage any help whatsoever, even those who are members of the party of the third part, without their first having produced a pass-card duly executed and signed by the authorized business agent of the party of the third part; said card to show that the bearer thereof is a member in good standing of the party of the third part, and that he has complied with the rules and regulations thereof in force at that time." The answer then alleged " that the said contract is in restraint of trade and the said contract has for its purpose the combination of employers and employees, whereby the freedom of the citizen, in pursuing his lawful trade and calling, is through such contract, combination and arrangement, hampered and restricted, and has also for its purpose the coercing of workingmen, to become members of the said Employees' Organization and come under its rules and its conditions, under the penalty of the loss of their positions and of deprivation of employment, and that such purposes are in restraint of trade, that they hamper and restrict the freedom of a citizen, in pursuing his lawful trade and calling and that they are against public policy and unlawful." To this defense, the plaintiff demurred, for being insufficient in law. The demurrer was sustained at the Special Term ; but, upon appeal to the Appellate Division, in the second department, the judgment sustaining the demurrer was reversed and the demurrer was overruled. Permission

was given to the defendants to appeal to this court and the following questions were certified for our review, namely :

" I. Is a contract made by an employer of labor, by which he binds himself to employ and to retain in his employ only members in good standing of a single labor union, consonant with public policy, and enforcible in the courts of justice in this state ?

" II. Is the ' Second' separate defense, contained in the answer herein of the defendants, Morris Cohen and Louis Cohen, insufficient upon the face thereof to constitute a defense ? "

If we refer to the prevailing opinion of the Appellate Division, it appears that the question in this case was there regarded as within our decision in *Curran* v. *Galen,* (152 N. Y. 33), and, hence, that the contract was unlawful because contrary to public policy. In this view, I think the learned justices below erred. The contract is annexed to, and made part of, the answer and is tripartite, between the defendants, Morris and Louis Cohen, a firm engaged in the tailoring business, their employés, represented by an attorney in fact, and a voluntary association, formed by the latter and called the Protective Coat Tailors' and Pressers' Union, of which the plaintiff is president. It provided for the employment by the Cohens of their employés, in their various skilled capacities, for the term of one year ; for a system of work by the week ; for the number of hours of work and for the mode of payment of the wages and, generally, for the regulation of the relations between the employers and their employés, including this particular agreement not to employ others than members of their employés' union. Whatever else may be said of it, this is the case of an agreement voluntarily made by an employer with his workmen, which bound the latter to give their skilled services for a certain period of time, upon certain conditions, regulating the performance of the work to be done, and restricting the class of workmen, who should be engaged upon it, to such persons as were in affiliation with an association, organized by the employers' workmen with reference to the

carrying on of the very work. It would seem as though an employer should be, unquestionably, free to enter into such a contract with his workmen for the conduct of the business, without its being deemed obnoxious upon any ground of public policy. If it might operate to prevent some persons from being employed by the firm, or, possibly, from remaining in the firm's employment, that is but an incidental feature. Its restrictions were not of an oppressive nature, operating generally in the community to prevent such craftsmen from obtaining employment and from earning their livelihood. It was but a private agreement between an employer and his employés, concerning the conduct of the business for a year and securing to the latter an absolute right to limit the class of their fellow-workmen to those persons, who should be in affiliation with an organization entered into with the design of protecting their interests in carrying on the work; as, indeed, the agreement recites. Nor does the answer aver that it was intended, thereby, to injure other workmen; or that it was made with a malicious motive to coerce any to their injury, through their threatened deprivation of all opportunity of pursuing their lawful avocation. To coerce workmen to become members of the employés organization, through such a contract, is not the allegation of something, which the law will, necessarily, regard as contravening public policy. The allegation that its " purposes are in restraint of trade," or that " they hamper and restrict the freedom of a citizen," or " that they are against public policy," is the mere statement of a legal conclusion.

If the question were more correctly presented by some appropriate allegation, I, still, would be of the opinion that the agreement is not one which comes under the condemnation of the law. The right of workingmen to unite and to organize for the protection of their interests and welfare is not denied. It has been, expressly and recently, declared by this court. (*Curran* v. *Galen*, 152 N. Y. 33; *National Protective Association* v. *Cumming*, 170 ib. 315, at pp. 320, 334, 338.) The inviolability of the right of persons to freedom of

action may well extend to any concert of action for legitimate ends, if consistent with the maintenance of law and order in the community and if not interfering with the enjoyment and the exercise by others of their constitutional rights. Their right to combine and to co-operate for the promotion of such ends as the increase of wages, the curtailment of hours of labor, the regulation of their relations with their employer, or for the redress of a grievance, is justifiable. Their combination is lawful, when it does not extend so far as to inflict injury upon others, or to oppress and crush them by excluding them from all employment, unless gained through joining the labor organization, or trades union. This we have decided and this the law of the state sanctions. (*Curran* v. *Galen, supra; National Protective Association* v. *Cumming, supra;* Penal Code, § 170.) As it was observed in *Curran* v. *Galen,* an underlying law of human society moves men to unite for the better achievement of a common aim and this social principle justifies organized action. Organization, or combination, is a law of human society. It is open to all orders of men, who desire to accomplish some lawful purpose through the greater strength and effectiveness, which organization offers over individual effort. If surrender of individual liberty is involved in combination, that is, nevertheless, but an extension of the right of freedom of action. If, therefore, the organization of workingmen is not obnoxious to moral, or to legal, criticism and only the use, or directing, of the power of the organization to injure others, by preventing them from following their trade, is visited by the law with its condemnation, how can it fairly be said that the refusal of a body of men to work with those not in affiliation with them and an agreement with the employer, by which such are excluded from the shop, is acting beyond legally justifiable limits? Whether the reason for the refusal be purely sentimental, or, whether based upon more substantial grounds, such as, for instance, an assurance of the character and of the competent skill of their fellow-workmen, is not material.

The case of *Curran* v. *Galen, (supra),* which stands

unaffected as an authority, presented a very different state of facts. There the plaintiff demanded damages of the defendants, who were officers and members of an association of workingmen in the brewing business in the city of Rochester, for having conspired to injure him and to take away his means of earning a livelihood. In substance, he alleged in his complaint that he was threatened by certain of the defendants, members of the association, that, unless he became a member, they would obtain his discharge from employment and would make it impossible for him to obtain any employment in that city or elsewhere; that, upon his refusing to become a member of the association, the defendants forced his employers to discharge him and, by false and malicious reports circulated in regard to him, sought to bring him into ill-repute with members of his trade and employers, and to prevent him from prosecuting his trade and earning a livelihood. The answer to the complaint, among other defenses, set up an agreement between the Ale Brewers' Association in the city of Rochester and the particular association referred to in the complaint, to the effect that all employés of the brewery companies should be members of the association and that no employé should work for a longer period than four weeks without becoming a member; and that, upon the plaintiff's refusal to comply with defendants' request to become a member of the association, his employers were notified thereof in accordance with the terms of the agreement with the Ale Brewers' Association. To this matter set up as a defense the plaintiff demurred and the order sustaining the demurrer was affirmed in this court. I endeavored to point out in the opinion that the agreement could be no justification for the acts charged in the complaint and that it could not legalize a plan for compelling other workingmen to join the defendants' organization, at the peril of being deprived of employment and of making a livelihood. However lawful and legitimate the purposes of the organization of the workingmen may have been, its power and influence were being unlawfully wielded in efforts to keep other persons from working at the particular

trade and to procure their dismissal from employment. In the general discussion of the question, I conceded the general right of workingmen to organize for the common good of the members and sought to show how the agreement and acts, there in question, were contrary to public policy and unlawful, because oppressive and restricting the freedom of others to engage in the same line of occupation, or to make a livelihood at their trade, as a penalty for refusing to join the defendants' organization. That was a very different case from the present one. The subsequent case of *National Protective Association* v. *Cumming*, (*supra*), in no wise overruled *Curran* v. *Galen*. It was not at all within the principle of the prior case. It concerned a dispute between rival labor organizations. The plaintiff organization sought to restrain the defendants from preventing the employment of its members and from procuring their discharge by any employer through threats and strikes, and the reversal of a judgment awarding the relief demanded was affirmed by this court. The right of the defendants, in that case, to refuse to permit their members to work with others, who were members of a rival organization, and to bring about their discharge upon the common work in which they were engaged, if confined to threats to withdraw from the work, or to ordering a strike of their own members, without resort to injurious acts, was admitted. The defendants' effort was not to compel the others to join with their organization as a condition of being allowed to work and, whether it was to secure only the employment of approved workmen, (which was a possible inference from the facts), or whether it was to obtain an exclusive preference in employment, if without resort to force, or the commission of any other unlawful acts, it was not within the condemnation of the law.

Within, even, the view expressed by the minority of the judges of this court in the *Cumming* case, the contract in the present case was not unlawful, which the employer made with his workingmen. Judge VANN asserted the right of every man "to carry on his business in any lawful way that

he sees fit.  He may employ such men as he pleases and is not obliged to employ those whom, for any reason, he does not wish to have work for him.  He has the right to the utmost freedom of contract and choice in this regard."  This contract was voluntarily entered into by the Cohens and, if it provided for the performance of the firm's work by those only who were accredited members, in good standing, of an organization of a class of workingmen whom they employed, were they not free to do so?  If they regarded it as beneficial for them to do so, (and such is a recital of the contract), does it lie in their mouths, now, to urge its illegality?  That, incidentally, it might result in the discharge of some of those employed, for failure to come into affiliation with their fellow-workmen's organization, or that it might prevent others from being engaged upon the work, is neither something of which the employers may complain, nor something with which public policy is concerned.

I think that the questions certified should be answered in the affirmative and, therefore, that the order of the Appellate Division, reversing the interlocutory judgment and overruling the demurrer, should be reversed and that the interlocutory judgment, which sustained the demurrer, should be affirmed, with costs in all the courts to the appellants.

VANN, J. (dissenting).  The contract which the court is about to pronounce valid and in accord with public policy is in substance as follows: The defendants were the party of the first part; their own employees, "by Barnard Kaplan, their representative and attorney in fact," party of the second part, and the Protective Coat Tailors and Pressers' Union, Local No. 55, of the United Garment Workers of America, a voluntary association organized by the parties of the second part, acting "through Barnard Kaplan, its secretary," party of the third part.  It consists chiefly of restrictive stipulations against the employers, who agree to employ the persons already in their employment "as operators, basters, finishers, pressers, fitters, bushelers and button-hole makers, each in his

own capacity and for no other work than that he was engaged for," during the period of one year. After fixing the number of working hours per week, it was agreed that "under no circumstances shall work be carried on by the parties of the first and second part at any other hours than herein specified without a written consent of the party of the third part, executed by its duly authorized officer, * * *."

It was further agreed "that the party of the first part shall not employ any help whatsoever other than those belonging to and who are members of the party of the third part, and in good standing and who conform to the rules and regulations of the said party of the third part; and the said party of the first part shall cease to employ any one and all those employees who are not in good standing and who do not conform to and comply with the rules and regulations of said party of the third part, upon being notified to that effect by its duly credentialed representatives. The party of the first part hereby agrees to abide by the rules and regulations of the .party of the third part, as known in the trade, and to permit and allow representatives of said party of the third part to enter their shop or shops at any and all hours of the day and night for the purpose of inspection and enforcement of the terms of this contract, as well as all the rules and regulations herein referred to. The party of the first part shall not engage any help whatsoever, even those who are members of the party of the third part, without their first having produced a pass card duly executed and signed by the authorized Business Agent of the party of the third part, said card to show that the bearer thereof is a member in good standing of the party of the third part and that he has complied with the rules and regulations thereof in force at that time. The party of the first part shall not employ more than one helper to every two operators, or one helper to two basters, and under no consideration to employ any apprentices."

The parties of the second part also agreed not to employ apprentices and to abide by the rules and regulations of the party of the third part. "In the event of any one of the

parties of the second part not remaining and continuing during the entire period of this contract in good standing, or does not in all respects conform with the rules and regulations of the party of the third part, then the party of the first part shall cease to employ such employee whoever he may be. * * * That the parties of the second part may quit work during a so-called 'sympathy strike,' provided no new demands are made by them; such quitting of work on their part shall in no way affect the validity of this agreement or suspend its operation." A minimum scale of wages was agreed upon, and finally the party of the first part agreed to deposit "and hereby does deposit with the party of the third part a promissory note in the sum of two hundred dollars, * * * as security for the faithful performance by the party of the first part of all the covenants and conditions herein contained * * * as liquidated and ascertained damages upon the commission of any breach or violation of any of the covenants herein above set forth on the part of the party of the first part, * * *." The only stipulation on the part of the union was that it would "furnish any and all help it may have on its application books," which it was to keep for the benefit of the other parties, without charge of any kind to any person.

The business affected did not belong to the union, or its members, but to the defendants, who agreed, voluntarily of course, to employ and discharge workmen at the dictation of the union. The labor department of the industry was under the control of the union, for both employer and employed, abrogating their own rights, placed themselves under its command in that respect. This was a form of slavery, even if voluntarily submitted to, for whoever controls the means by which a man lives controls the man himself. Both the proprietors and the workmen seem to have walked under the yoke of the union without a protest. The employers could employ no one who was not a member of the union and not even then unless he bore its pass card. They could have no apprentices. Even in an emergency and with the consent of their workmen they could not exceed the hours of labor pre-

scribed by the union. A baster, however willing, could not
sew on a button and a presser, even if he wanted to, could
not make a button hole. If a strong man, capable of work-
ing ten hours a day, wished to do so and his employers were
willing to pay him extra for the overtime, he could not with-
out the written consent of the union. A qualified workman,
not a member of the union, might be unwilling to join, yet
he could not get work unless he did. If an employee wished
to leave the union, he could not without losing his place. The
employers could not hire non-union men who wished to work
for them, nor have extra helpers in their business and even
the workmen themselves could not take apprentices. Employ-
ers were bound to abide by the rules and regulations of the
union and permit its representatives to enter their shops at
any and all hours of the day and night for the purpose of
inspection and enforcing the terms of the contract as well as
the rules and regulations. The employees could refuse to
work during a " sympathy strike " and paralyze the business
without affecting the validity of the agreement. They were
bound to obey the rules and regulations of the union, what-
ever they might be, that were in force at any time during the
year covered by the agreement.

Thus master and men bound themselves by these remark-
able stipulations made with a voluntary association, which
had no pecuniary interest in the business, or in the labor of
those employed. The labor of the employees belonged to
themselves and they had a right to sell it to whom they chose
and on such conditions as were mutually satisfactory. The
business belonged to the defendants and they had the right to
employ any man who was willing to work for them, but by
this agreement an outsider intervened and compelled those
who owned the business and those who did the work to sub-
mit to its direction. As was said by the court below, the will
of the employer " was subjected by executory contract to an
arbitrary domination which not only deprived " him " of all
freedom of action, but also crushed the rights and interests of
all independent competition in the field of labor,"

The manifest purpose of the contract was to prevent competition and create a monopoly of labor. A combination of capital, or labor, or as in this case of both, to prevent the free pursuit of any lawful business, trade or occupation is forbidden both by statute and the common law. (*Matter of Davies*, 168 N. Y. 89; L. 1897, ch. 383, § 1.) A labor trust in restraint of free labor is opposed to sound public policy the same as a trust of capital in restraint of free production, and any agreement by which either object is sought to be accomplished is illegal and void. The contract in question was a combination in the interest of monopoly to prevent the employment, as well as to compel the discharge of competent men who were willing to work. Its primary object was to create a monopoly to benefit the members of a single labor union by compelling the discharge of good men who wished to work but were too independent to join the union under compulsion, or if they were members already, by compelling them to remain such against their will. While there may have been other purposes, they were incidental to this main purpose, which runs through the contract from the first stipulation to the last. The agreement created an unlawful combination or trust, because it monopolized the market by excluding from employment all who did not belong to this one union, and compelled the discharge of all in employment who would not join it. The means used was not persuasion, but coercion. The provisions which restrict both master and men from taking apprentices are significant as a clear violation of public policy, for they tend to prevent the training of youths into skilled workmen to the great disadvantage of the state. The stipulation permitting a strike without a grievance, simply out of sympathy for those employed elsewhere, was also illegal, for it tended to promote business paralysis throughout the country. The employers would be compelled to suspend work, not because their men were dissatisfied with their own condition, but because they felt sorry for others in a less fortunate condition, over which their own employers had no control. In other words, if

workmen in California or in Russia struck, with or without just grounds, the party of the second part could strike also.

This case is quite analogous to that of *Curran* v. *Galen* (152 N. Y. 33), which, as it is admitted, has not been over-ruled, but is still the law. The defense relied upon in that case to justify those who procured the discharge of a work-man from employment was an agreement between a brewers' association and a labor union, " to the effect that all employees of the brewery companies belonging to the Ale Brewers' Association shall be members of the Brewery Working-men's Local Assembly, 1796, Knights of Labor, and that no employee should work for a longer period than four weeks without becoming a member." It was alleged that the plain-tiff, a non-union employee, was retained by one of the brew-ery companies for more than four weeks after notice to become a member of the union, and that the defendants, as a committee of the union, without intent to injure the plaintiff, notified the company of such violation of the agreement, which led to his discharge. It was held that these facts con-stituted no defense, because the agreement was void as against public policy. The court said : " Public policy and the inter-ests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to impair, or to restrict, that freedom, and through contracts or arrangements with employers to coerce other workingmen to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their position and of depriva-tion of employment, then that purpose seems clearly unlawful and militates against the spirit of our government and the nature of our institutions. The effectuation of such a pur-pose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges. It would tend to deprive the public of the services of men in useful employ-ments and capacities. It would, to use the language of Mr. Justice BARRETT in *People ex rel. Gill* v. *Smith* (5 N. Y. Cr. Rep. at p. 513), ' impoverish and crush a citizen for no

reason connected in the slightest degree with the advancement of wages, or the maintenance of the rate.' Every citizen is deeply interested in the strict maintenance of the constitutional right freely to pursue a lawful avocation, under conditions equal as to all, and to enjoy the fruits of his labor without the imposition of any conditions not required for the general welfare of the community. The candid mind should shrink from the results of the operation of the principle contended for here, for there would certainly be a compulsion, or a fettering, of the individual, glaringly at variance with that freedom in the pursuit of happiness which is believed to be guaranteed to all by the provisions of the fundamental law of the state. The sympathies, or the fellow-feeling, which, as a social principle, underlies the association of workingmen for their common benefit, are not consistent with a purpose to oppress the individual who prefers by single effort to gain his livelihood. If organization of workingmen is in line with good government it is because it is intended as a legitimate instrumentality to promote the common good of its members. If it militates against the general public interest, if its powers are directed towards the repression of individual freedom, upon what principle shall it be justified ?  *  *  *  So far as a purpose appears from the defense set up to the complaint that no employee of a brewing company shall be allowed to work for a longer period than four weeks without becoming a member of the Workingmen's Local Assembly, and that a contract between the local assembly and the Ale Brewers' Association shall be availed of to compel the discharge of the independent employee, it is in effect a threat to keep persons from working at the particular trade and to procure their dismissal from employment."

This long quotation is warranted by the strong reasoning which applies directly to the case in hand. I unite with Judge GRAY in recognizing that case as a sound exposition of he law. I invoke its authority as controlling this appeal, for the facts of the two cases are so analogous that the same principle must govern both. If the agreement in that caes

was against public policy, what is to be said of the one before us? That agreement was held void because it required the discharge of workmen if they would not join a particular union, thus compelling them to join against their will. This agreement contains the same requirement, because the phrase " cease to employ " is merely a euphemism for the word " discharge," and in addition there are other provisions equally subversive of personal liberty and equally opposed to public policy.

Would a court of equity enforce such an agreement by a decree for specific performance? Would it command the employer to discharge workmen simply because they refused to join the union? Would it restrain him from employing competent men because they were not members of the union? Would it restrain him or his employees from taking apprentices? Would it compel both master and man to obey the regulations of the union, whether reasonable or unreasonable?

The promissory note sued upon is collateral security for the faithful performance of the agreement by the employer, and a violation of any stipulation thereof, according to its terms, renders the note collectible. Will a court of law make the employer pay the note because he refused to discharge a competent man who would not join the union, or who resigned from the union, or refused to obey its rules and submit to its dictation? Will it permit a recovery thereon because non-union men were employed, or apprentices taken, or for a failure to comply with any one of the many stringent stipulations? I think that neither a court of equity nor a court of law should attempt to enforce the agreement, directly or indirectly, because it is utterly void as a flagrant violation of public policy. I vote for affirmance.

CULLEN, Ch. J., HAIGHT and WERNER, JJ., concur with GRAY, J.; BARTLETT, J., concurs with VANN, J.; O'BRIEN, J., absent.

Ordered accordingly.