HARPER et al. v. LOCAL UNION NO. 520, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, et al.

No. 7791.

Court of Civil Appeals of Texas. Austin.

March 30, 1932.

Rehearing Denied April 20, 1932.

George Mendell and Hart, Patterson & Hart, all of Austin, for appellants.

James A. King and S. L. Staples, both of Austin, for appellees.

McCLENDON, C. J.

Suit by Local Union No. 520, International Brotherhood of Electrical Workers, a voluntary unincorporated local labor union (herein called the union), its officers and members, against W. O. Harper and O. C. Linscomb, a copartnership, engaged in the business of electrical contractors (herein called the contractors), to enforce an agreement between the union and the contractors, whereby the latter agreed to employ only members of the union in good standing. The appeal is from an interlocutory order after notice and hearing granting a temporary injunction restraining the contractors from violating the provisions of the contract, pending decision of the case upon its merits.

The contentions of the contractors (appellants) may be summarized in the three following propositions:

(1) The agreement is unilateral and wanting in consideration, in that it does not impose any obligation upon the union to supply labor to the contractors.

(2) The agreement in effect is for personal service, which cannot be enforced by specific performance, and therefore, under the doctrine of mutuality of remedy, injunction, which in effect is specific performance, is not available to the union.

(3) "The effect of the agreement is to require employers of electrical construction workmen at Austin to employ only members of the labor union for electrical construction work in Austin and surrounding territory, and to render membership in the local union an indispensable condition to any workmen obtaining employment; it is therefore against public policy."

Since the petition was verified and furnishes the basis for the temporary injunction, we copy in full its recitative allegations:

"2. That the plaintiff, Local Union No. 520, International Brotherhood of Electrical Workers is an association organized for the purpose of securing work for its members, for maintaining fair wages for their members for labor and for the use and benefit of its employees to enter into all contracts which may be proper, necessary or essential to securing the benefits of its membership or all the purposes necessary and essential to the carrying to a successful conclusion all the purposes herein named. It is further the policy of said Local Union to secure for its members more remunerative compensation and improved conditions of employment, and to organize all electrical workers of Austin, Texas, and vicinity into a Local Union; to develop and to maintain a higher standard of skill, to encourage the formation of schools of instruction for teaching the practical application of electricity and for trade education generally, to promote reasonable methods of work, to cultivate feelings of friendship among those of that craft, to settle all disputes between employers and employees by arbitration (if possible), to assist each other in sickness or distress, to secure employment, to reduce the hours of daily labor, to secure adequate pay for other work, and by legal and proper means to elevate the moral, intellectual and social conditions of the members, their families and dependents, in the interest of a higher standard of citizenship; that all the plaintiffs above designated with the exception of Local Union No. 520, International Brotherhood of Electrical Workers specifically named, are members of the aforesaid Local Union, in good standing and join with the said Local Union as plaintiffs herein and for cause of action say:

"3. That there are and have been for some years past in the City of Austin, Travis County, Texas, several contractors who engage in construction work and accept contracts for the installation of all kinds of electrical work, electrical wiring and all manner of electrical construction and installation which is common to the building and construction industry, and for such purpose said building contractors were and are in need of skilled and technical electricians such as these plaintiffs, who are conversant and who have expert

knowledge common to the craft of electrical workmen, and who are capable of doing and performing all kinds of electrical work, electrical wiring, and each and every kind of skilled technique and knowledge common to and required by those who understand the construction, manipulation, and maintenance of electrical appliances, and for the control and transmission of electrical current, etc., and all ancillary and correlated matters pertaining to such craft and vocation, and especially to estimate the cost of installing electrical appliances and equipment upon which to base contractors bids for work on new construction work, to make estimates and work out costs of materials, cost of labor on new construction work; to do and to perform all such work as applied to general inside electrical construction which covers and includes wiring for light and power inside of buildings.

"4. That in carrying out the purposes of its being and organization, and for the purposes of maintaining and securing to its members a fair and continuous wage scale and employment, said plaintiff, Union Local No. 520, International Brotherhood of Electrical Workers, on the 5th day of April, 1930, made and entered into the following contract and agreement with the certain contractors of Austin, Texas, which said contract is in words and figures as follows:

" 'The State of Texas, County of Travis.

" '1. This agreement entered into by and between the Electrical Contractors of Austin, Texas, party of the first part, and Local Union # 520 International Brotherhood of Electrical Workers, party of the second part.

" '2. Local Union # 520 is a part of the I. B. E. W.

" '3. Party of the first part agrees to employ only members of Local Union # 520 I. B. E. W. in good standing.

" '4. The regular hours of labor shall be from 8 a. m. to 12 noon, from 1 p. m. to 5 p. m., except Saturday, which will be from 8 a. m. to 12 noon.

" '5. Time from 5 p. m. to 12 midnight shall be paid for at the rate of time and one-half for the regular eight hours rate.

" '6. Time from 12 midnight to 8 a. m., Sundays and holidays, shall be paid for at the rate of double the regular eight hour rate.

" '7. Holidays will be: Fourth of July, Labor Day, Armistice Day, Thanksgiving Day and Christmas.

" '8. When any electrician is required to leave Austin he shall be paid time for travelling from and back to Austin at the regular eight hour rate of pay. He shall be furnished his transportation, meals and lodging while out of Austin, Texas.

" '9. The party of the second part agrees to furnish one competent journeyman in emergence to each shop in signing this agreement on Saturday afternoon from 1 p. m. to 5 p. m., at the regular eight hour rate of pay.

" '10. A journeyman electrician shall be paid for services rendered the minimum sum of Nine ($9.00) Dollars for the regular eight hours herein mentioned from 1st day of April, 1930, to last day of March, 1931, per day of regular eight hour rate, and Nine Dollars and fifty cents ($9.50) from 1st day of April, 1931, to last day of March, 1932, per day of regular eight hour rate. Ten ($10.00) Dollars from the 1st day of April, 1932, to the last day of March, 1933, per day of regular eight hour rate.

" '11. Party of the second part agrees to make good or see that journeyman members make good on their own time any work that is not properly installed by them unless work was done according to instructions of party of the first part.

" '12. If the journeyman in fault refuses to make good said work or has left the contractors employment or for any reason cannot be back on the job, then party of the first part may have the work rectified by another journeyman and the cost shall be paid by the party of the second part.

" '13. An employer shall be allowed one apprentice for the first journeyman working, and then shall be allowed an apprentice for each additional three journeymen employed.

" 'Signed this 5th day of April, 1930.
" ' [Seal]

" 'J. O. Andrewartha
" 'Jno. L. Martin
" 'Fox-Schmidt
" 'Electrical Contractors Committee.
" 'Local Union # 520 I. B. E. W.
" 'W. L. Baker, President
" 'Henry P. Cain, Secretary
" 'J. H. Brown, Chairman of Committee.
" 'A. W. Schmidt
" 'University Plumbing, Heating and Electric.
" 'By John Wattinger
" 'Chas. Spreen
" 'Bert Williams Electric Co.
" 'B. E. Howell & Son
" 'Harper & Linscomb
" 'By C. C. Linscomb
" 'Bacons 2 in 1 Service
" 'By G. H. Bacon
" 'Moody Elect. Co.
" 'Ben T. Moody
" '[Seal] Eugene Ashe Electric Co.
" 'By Fred B. Otto.'

"5. Plaintiffs further allege that said contract is a several and individual contract between plaintiffs and the several contractors whose names are affixed thereto; and that all of said contractors have kept and performed said contract according to the face and tenor, effect and reading thereof save and except

the defendants herein named; and that the contract aforesaid made by and between the plaintiffs and the defendants was made by said Local Union No. 520 International Brotherhood of Electrical Workers for the use and benefit of all its members in good standing; and that same was ratified and approved by the members thereof, the remaining plaintiffs herein; and that under the contractual obligations of the defendants of Plaintiffs during the life of said contract, only members of Local Union No. 520 International Brotherhood of Electrical Workers in good standing, were to be employed by said Defendants and such right of employment inured to and vested in and became a valuable property right of every member of said Local Union aforesaid, these plaintiffs which right accrued under and by virtue of the aforesaid contract and the ratification and adoption thereof by all of the aforesaid Local Union.

"6. That said defendants, Harper and Linscomb, after the execution of the contract aforesaid entered into the fulfillment of their contractual obligations, and from the membership of the plaintiff, Local Union No. 520 International Brotherhood Electrical Workers, said defendants selected three (3) members thereof in good standing and employed them as electricians in their electrical plant and in their electrical contract work.

"7. That said contract was in all things fulfilled by the said defendants as well as the plaintiffs herein up until the 31st day of August, 1931, when said defendants without cause discharged the electricians in their employment, who were members of the Electrical Workers Union aforesaid and gave notice to them and through them to all the remaining plaintiffs herein, that they would not in the future hire- or employ any of the members of said Electrical Workers Union or any of the plaintiffs herein; and that they would not pay the wage scale as set out in said contract, which provided for Nine Dollars and Fifty Cents ($9.50) per day for each member of said Electrical Workers Union so employed by the electrical contractors of the City of Austin, at that time but that they, said defendants, would pay a much smaller wage scale; and that they intended and would in the future while and employ non-union electricians at a much smaller and decreased wage scale; and that notwithstanding the fact that said contract is in full force and effect until the 1st day of March, 1933, said defendants announced and declared that it was their intention to breach and violate said contract and to refuse to be bound by it or any of its terms; that since the discharge of said employees aforesaid, members of said Electrical Workers Union, said defendants have constantly refused and still refuse to employ from among the membership of said Local Union No. 520 International Brotherhood Electrical Workers any of the members thereof in good standing; all of whom are plaintiffs herein, but on the contrary, has attempted to breach and violate such contract and still is attempting so to do, and has employed non-union electricians at a much smaller wage scale to take the place of the three (3) electricians who are members of the said Electrical Workers Union aforesaid and plaintiffs herein.

"8. Plaintiffs further allege that said contract made with said defendants which provides for the exclusive employment of none but members of the Electrical Workers Union named heretofore, is a valid, legal, outstanding and unimpaired contract, and cannot be repudiated by the defendants without great and severe loss to these plaintiffs, all of whom have a vested, fixed and well determined property right in and to the same, and to the right to be employed by said defendants from time to time as provided by the contract.

"9. That said contract commenced and was in full force and effect on the 5th day of April, 1930, and by its terms and stipulations did not expire until the 31st day of March, 1933, and that the same was breached and violated by said defendants on the 31st day of August, 1931; that the vested and property rights in said contract up until the 31st day of March, 1933, is far in excess of One Thousand ($1000.00) Dollars, and within the jurisdiction of this Honorable Court.

"10. That each and every one of the plaintiffs herein have a vested right in said contract; and that the same was made by said Electrical Workers Union for the use and benefit of its members; and that if the defendants are allowed to continue to breach and to break said contract, the monied value and pecuniary remuneration guaranteed and fixed by said contract up to and including the 31st day of March, 1933, will be lost to these plaintiffs; that said contract was entered into by and between the plaintiffs, the said Local Union No. 520, International Brotherhood Electrical Workers, in good faith for the purpose of securing to its constituent members the exclusive employment by the defendants with a certain definite wage scale therein fixed, which matters and things were satisfactory to, ratified by, and approved by said members; that said plaintiff, Electrical Workers Union of International Brotherhood of Electrical Workers and the remaining plaintiffs herein come now before this Court and allege their good faith in the entering into and acceptance of said contract; and that they come into this Court of Equity with clean hands and ask for the interposition of this Court to protect their vested rights in the contract aforesaid.

"11. Plaintiffs further allege that they will suffer irreparable injury unless they are given the relief herein prayed for, because of

this, to-wit: That they have no speedy, adequate plain and certain remedy at law; and that the injuries suffered and continued to be suffered cannot be measured by any certain pecuniary standard by reason of this, to-wit: That under the contract aforesaid, the defendants bound and obligated themselves to employ their electricians from among the membership of the said Local Union No. 520, International Brotherhood of Electrical Workers; that no specific number of employees were named who were to be so employed, nor the length of time they were to be retained, it being contemplated that such employees as the defendants desired to employ would be taken from the body of the membership of Local Union No. 520, International Brotherhood of Electrical Workers; and that this continued employment of such held as they desired to retain should be taken exclusively from the membership of said Local Union No. 520, up until the 31st day of March, 1933; and, therefore, these plaintiffs come and say that the damages sustained by them and each of them cannot be measured by any pecuniary standard known to the law.

"12. Now come the plaintiffs and further allege and show to the Court their willingness to do equity herein; that the individual membership of said Local Union No. 520, plaintiffs herein, stand ready to do and perform all the obligations assumed by them under said contract, and to furnish to the said defendants any and all skilled and efficient workmen and electricians as might be desired; that plaintiffs are by occupation electricians of experience and are expert and proficient in said craftsmanship, and calling, and fully competent to perform all the duties of an electrician, being able bodied, industrious and sober, with no habits disqualifying them from efficiently performing the duties of an electrician; and the defendants having discharged from their employment the members employed in their place non-union workers in violation of said contract, has in that particular work irreparable injury to the membership of said Local Union No. 520 International Brotherhood Electrical Workers by being refused employment as electricians by said defendants, and by not being permitted in the employment of said defendants or to continue therein.

"13. Plaintiffs further allege that defendants have violated said contract further, and have done and are doing acts continuous in that nature, which will necessitate a multiplicity of suits against said defendants unless these plaintiffs are given the relief herein prayed for; that since the 31st day of August, 1931, said contract has been breached and violated and plaintiffs believe and so charge that same will continue to be breached and violated throughout the remaining of the contract term unless plaintiffs are granted the interposition of equity to prevent the same

and that each day constitutes a separate breach of said contract by defendant.

"14. Plaintiffs further allege that the contract aforesaid does not create a monopoly, is not in restraint of trade, and in nowise is violative of the Anti-trust laws of the State of Texas, but that said contract is specifically excepted from the terms of the Anti-trust statutes of the State of Texas as set out and expressed in articles 1642, 1643 and 1644 of the Penal Code of the State of Texas, and articles 5152, 5153 and 5154 of the Revised Civil Statutes of Texas, nor is it violative of the Anti-trust Statutes of the United States as shown by the U. S. Code, title 15, 'Commerce & Trade,' § 17 [15 USCA § 17].

"15. Plaintiffs further allege and say that the acts and violations of the contract herein complained of and sought to be enjoined are continuous in their nature and plaintiffs allege and charge that each and every day in the future will constitute a separate and continuous violation of the aforesaid contract by the defendants; and that the issuance of the writ of injunction which is asked for herein, plaintiffs come now and say that a multiplicity of suits can be avoided.

"16. Plaintiffs further allege that for the redress of the wrongs and injuries herein complained of, that they have no adequate remedy at law, as hereinbefore set out, but if this Court should hold that they have a remedy at law, which plaintiffs deny then these plaintiffs come and say in the alternative that whatever remedy at law they may have, it is totally inadequate to protect the plaintiffs, to prevent damage and to redress the injuries, which have heretofore accrued, and the threatened injuries to accrue in the future.

"17. Plaintiffs further allege that they have no adequate remedy at law and in fact no remedy at law of any kind or character in as much as the privileges of the employment designated by the contract can not be restored or renewed in as much as many days have passed since the original breach and violation of the contract, and the same will continue to be breached in the same way and manner unless controlled by the order of this Court, and it will be impossible for plaintiffs to designate any certain monies that might be due to them or any of them, and the right of these plaintiffs severally, to be entitled to employment by defendants have been and will continue to be so intermingled with the rights of all the members of said Local Union No. 520, International Brotherhood Electrical Workers, so that there will be impossible for plaintiffs to designate the names of any particular plaintiff who might have been employed by the defendants during the remainder of the contract term or to designate any certain monies that might have been received by any plaintiff for such employment and

when, where and under what circumstances it had been or would be received or the amount thereof.

"18. Plaintiffs further represent to the Court that even if any remedy at law existed, it would give rise to and necessitate a multiplicity of suits in as much as each and every member of Local Union No. 520, International Brotherhood of Electrical Workers and plaintiffs herein is injured by the violation of said contract and by being discriminated against in violation of his contract rights; by being denied employment by the defendants; and that each and every one of the plaintiffs herein so injured and damaged and discriminated against is entitled to an action against said defendant for redress of said injuries and to prevent said wrongful acts."

The answer does not controvert any specific allegation of the petition, but sets up the following as a justification for appellants' action in breaching the contract: "* * * That they are citizens and taxpayers in the City of Austin, and are engaged in the business of contracting and installing electrical wiring for the building trade generally, and have been so engaged in said business for many years; that in the general course of their business they employ skilled electrical workers from time to time; that during the past year the initial cost of all material for building construction, including wiring material and its parts, have declined in price almost fifty per cent; that since the first of the year, the defendants have been conducting their electrical wiring business at a financial loss, owing to the high price demands of plaintiffs; that on or about August 1st, 1931, the defendants served notice on three members of plaintiffs' Union, that on September 1st, 1931, the daily wage scale for them would be reduced to $7.50 per day, and tendered the said three members of said Union their regular jobs at that price per day; that plaintiffs refused to accept same, and severed their employment with defendant; that the defendants at once procured skilled electrical workers, at the price offered plaintiffs, and have had them continuously employed ever since, for all of which the defendants are ready to verify."

Upon the hearing Linscomb testified that, so far as the employment of labor was concerned, the contract embraced practically all the electrical contractors in Austin, and some "out-of-town people" who "come in here and take a job and go back home." On cross-examination he testified that Mr. Grimmer, who was not a party to the contract, "is an electrical contractor in this city and operates in electrical work just like I do. I don't know how many employees he has at a time. I have got two of his men now." He also named another Austin electrical contractor not a party to the contract. Additionally he named five other parties who held electrical contractor's licenses, concerning whom he testified on redirect examination: "These men go out and get work, when they take out their license it is presumed that they are going into the contracting business, and each and every one that takes out a license we presume is going into the contracting business. If he gets more work than he can handle by himself, he hires an electrician to assist him in the job."

He further testified: "When a contractor comes to Austin to do a job he has to sign up an agreement along that line if he works union men."

The following evidence came from appellee's witnesses:

Grimmer, who refused to sign the contract, employed from one to three electricians (the latter figure is the number employed by appellants). Two of the signers of the contract had headquarters in Fort Worth and Houston, but at the time they had electrical contracts in Austin. All the signers except appellants lived up to the contract. "I think there were electrical workers in Austin who were not members of the union. I only know of one competent electrician and two or three that I would not consider competent electricians. * * * I would not say that there are a number of persons in Austin who came within that designation (electrical workers) at this time but who are not members of the local union. There is only one that I would say is an electrician." (In explanation he stated that the others were unskilled.) The contract was the result of negotiations and compromise, entered into at the expiration of a prior agreement. The union drew a new agreement at the expiration of the old one, and presented it to the contractors, who got together and "refused to accept the agreement that we wrote up, but presented to us a contract of their own that they had written up." The contract in suit "is the contract that was drawn up and presented to the Union by the electrical contractors. * * * Mr. Linscomb is the one who signed it for Harper & Linscomb. Mr. Linscomb did not say anything about having any objection to signing that contract in any way." Of the thirty who constituted the union's membership at the time the suit was brought, and who were named in plaintiffs' petition, some 18 or 20 were members when the contract was executed; the others had later come to Austin and affiliated with the union. "On the other hand, there were a number of persons who were members of the local union at the time the contract was signed, who have moved away from Austin now, and are no longer members of the local union. All who were members of the union when the contract was signed and who still live in Austin are members of the union, and none have withdrawn from the union and later rejoined." One withdrew "because he has quit working with

the tools." "A number of them have moved away from Austin, and are not now under the jurisdiction of the local council." "The city of Austin pays the union scale prescribed in this contract—pays the scale for that character of work. * * * We do not control that—do not attempt to control it." Doss, the city electrician, is an honorary member of the union. "After you get over a certain age you can work for whatever you can get. It would be permissible for Mr. Doss to go out and do what you get nine dollars a day for, for five dollars a day. That is, after he gets a certain age. He would not be bound by that agreement. I believe we have one other man" whose "age limit puts him outside of the agreement." "As to what regulations are around (Mr. Doss) him in regard to his working for the city—there is no agreement with the city, because they do not do any inside electrical work. Mr. Doss does not do any of the work which is contemplated in this contract—the city will not let him."

There was no showing as to the avenues of employment in Austin open to skilled electricians other than "electrical installing," which was the subject-matter of the contract.

The questions raised are in large measure of first impression in this state, and in some respects present conflict of view in other jurisdictions where they have arisen.

The principles of law that have been applied to collective bargains between employers and employees are of comparatively recent development, and have been largely influenced by new conditions that have arisen under methods employed in modern industry.

In a very recent case (1931) by the Supreme Court of Mississippi, which enforced on behalf of an employee an agreement of this nature, the court said: "From the time two hundred years ago, when in England labor unions were held to be criminal conspiracies, on down even to a recent period, the struggles of these unions for full recognition in. the law upon a favorable basis has been somewhat arduous and beset with obstacles. The time has at last arrived, however, when, under patriotic and intelligent leadership, their place has become secure in the confidence of the country, and their contracts are no longer construed with hesitancy or strictness, but are accorded the same liberality, and receive the same benefits of the application of the principles of the modern law, bestowed upon other agreements which appertain to the important affairs of life." Yazoo & M. V. R. Co. v. Sideboard, 133 So. 669, 671.

The following is from a dissenting opinion of Mr. Justice Holmes while a member of the Supreme Court of Massachusetts (Vegelahn v. Guntner, 167 Mass. 108, 44 N. E. 1077, 1081, 35 L. R. A. 722, 57 Am. St. Rep. 443): "One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of capital, to get his services for the least possible return. Combination on the one side is patent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way. * * *

"If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that, when combined, they have the same liberty that combined capital has, to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control. I can remember when many people thought that, apart from violence or breach of contract, strikes were wicked, as organized refusals to work. I suppose that intelligent economists and legislators have given up that notion to-day. I feel pretty confident that they equally will abandon the idea that an organized refusal by workmen of social intercourse with a man who shall enter their antagonist's employ is unlawful, if it is dissociated from any threat of violence, and is made for the sole object of prevailing, if possible, in a contest with their employer about the rate of wages. The fact that the immediate object of the act by which the benefit to themselves is to be gained is to injure their antagonist does not necessarily make it unlawful, any more than when a great house lowers the price of goods for the purpose and with the effect of driving a smaller antagonist from the business."

The general trend of decisions has been to recognize collective bargaining agreements when fairly made and for the lawful purpose of securing employment, shorter working hours, and better working conditions. When so made, such agreements are generally held to be in the public interest, as offering peaceful solutions of labor disputes, and preventing strikes and lockouts, and incidental loss arising from unemployment and violence.

These agreements are now regarded as primarily for the benefit of the members of the union, and under a variety of theories have been held to be enforceable by the members. Some courts have held that the contracts establish usages or customs of trade; a distinction being sometimes drawn between usage and custom. Other courts, holding that the association acts for its members, have applied the general principles of agency. While still others, as in the Mississippi case above quoted from, treat the agreement as one made for the benefit of third parties.

We are not concerned here with the agreement from the viewpoint of the legal rights inuring thereunder to the individual members of the union; and it will not be necessary

to cite authorities upon the above holdings. The subject is discussed, with citation of authorities, in an article entitled "Collective Labor Agreements in American Law," published in the February, 1931, issue of the Harvard Law Review.

Aside from those aspects of the agreement which give rise to legal rights in favor of the individual members of the union as such, who have brought themselves within its purview, the collective agreement is now treated in a number of jurisdictions as a contract also, between the organization or group as such and the employer; and, where violated by, the former, may be enforced by the latter, through appropriate remedy. Instances have arisen where the organization, its officers and members have been enjoined at the instance of employers from calling or inciting a strike, or of engaging in other concerted acts in violation of the collective agreement. Burgess v. Georgia, F. & A. Ry. Co., 148 Ga. 417, 96 S. E. 865; Gilchrist Co. v. Metal Polishers (N. J. Ch.) 113 A. 320; Nederlandsch, etc., v. Stevedores' etc. (D. C.) 265 F. 397, 400. Due, no doubt, to the general attitude of aversion on the part of organized labor to interference in labor disputes by court action, resort by labor unions to the courts for redress of grievances has been rare until comparatively recent years; and, as a consequence, there is a paucity of adjudications defining and prescribing the limitations upon the rights of labor unions as parties plaintiff. While the decisions are by no means uniform in many respects upon specific questions that have arisen, generally speaking the courts have sought to apply the recognized principles of contract law to collective bargaining agreements. Differences in decision arise in the main from difference of view in the application to specific situations of generally accepted legal principles.

The right of labor to contract collectively for employment, and for other advantages, such as wage scales, hours of employment, favorable surroundings and working conditions, and the like, is now generally recognized. Leading cases upon this subject are Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 6, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280, and Tracey v. Osborne, 226 Mass. 25, 114 N. E. 959.

The former by the Court of Appeals of New York in 1905 has been followed in the following cases by the Appellate Division of the Supreme Court of that state: Schlesinger v. Quinto (1922) 201 App. Div. 487, 194 N. Y. S. 401, 409; Maisel v. Sigman (1924) 123 Misc. Rep. 714, 205 N. Y. S. 807; Goldman v. Cohen, (1928) 222 App. Div. 631, 227 N. Y. S. 311; Ribner v. Rasco (1929) 135 Misc. Rep. 616, 238 N. Y. S. 132, 133.

The Massachusetts case followed the reasoning in the earlier leading case in that jurisdiction of Pickett v. Walsh (1906) 192 Mass. 572, 78 N. E. 753, 6 L. R. A. (N. S.) 1067, 116 Am. St. Rep. 272, 7 Ann. Cas. 638. It has been followed in a number of subsequent cases in that state.

We shall not enter into a general discussion of what subjects have been held properly and what improperly to fall within the legitimate purview of collective bargaining. The question is treated in much detail in chapter 22 (page 375 et seq.) of Oakes "Organized Labor and Industrial Conflicts."

Apropos, however, the case at bar it is quite generally held that contracts providing for the employment of only members of a particular union are not on that account alone invalid and unenforceable. See New York and Massachusetts cases above cited. Also Adler & Sons v. Maglio (1929) 200 Wis. 153, 228 N. W. 123, 66 A. L. R. 1085; Stearns Lumber Co. v. Howlett (1927) 260 Mass. 45, 157 N. E. 82, 52 A. L. R. 1125; Hobarn v. Dempsey (1914) 217 Mass. 166, 104 N. E. 717, L. R. A. 1915A, 1217, Ann. Cas. 1915C, 810; National F. Co. v. Mason, etc. (C. C. A., 2d Circuit) 169 F. 259, 266, 26 L. R. A. (N. S.) 148.

We will now consider the specific objections urged by appellants against enforcement of the agreement in issue through the remedy invoked in this case.

In the recent case of M. & M. Pipe Line Co. v. Menke, 45 S.W.(2d) 344, 345 (error refused), this court stated a general rule of construction of contracts as follows: "It is a cardinal rule in the construction of contracts that they be given a practical interpretation with a view to effect the intention of the parties as gleaned from the language of the instrument, the subject-matter dealt with, the surrounding circumstances, and the objects sought to be accomplished. Stevens v. Ry. (Tex. Com. App.) 212 S. W. 639."

■■ When so viewed, we do not believe the agreement is unilateral, in that it imposes no obligation upon the union. While it is true that there is no express agreement on the part of the union to furnish labor at the prices and under the terms and conditions prescribed in the contract, its very purpose and object was to prescribe terms under which the members of the union would work and the contractors would employ. It was therefore, we think, a necessarily implied term of the agreement that the union, its officers and members would, collectively abide by the terms of the agreement, and would not collectively or as an organization exercise any right or do any act it or they might otherwise lawfully exercise or do, which was in conflict with any of the terms of the agreement; and that the union would enforce the contract to the extent of its powers over its members under its constitution and by-laws. Clearly, we think, what the contractors were bargaining for and what they obtained under the agree-

ment was freedom from industrial dispute, strike, or collective adverse action on the part of the union, its officers and its members during the term covered by the agreement. As we have already pointed out, this right, if infringed, could be enforced by injunction at the instance of the contractor. Exactly in point upon this construction of the contract is Nederlandsch, etc., v. Stevedores', etc., above, from which we quote:

"The contract is inartificially drawn and in terms imposes no obligation on respondents to furnish labor. It must be given a reasonable construction, however, and so as to maintain its validity, if possible. The contract absolutely binds all of the ship agents and employing stevedores of the port of New Orleans to employ none but members of the respondent unions, if they are available. By it the respondents establish the principle of collective bargaining, obtain the closed shop, 44-hour week, extra rates of pay for overtime, and their own working conditions, all that union labor, so far, has ever contended for. I think the contract is valid, and imposes the reciprocal obligation on respondents to work according to the contract in good faith. There is no doubt the action of the men was arbitrary and amounted to a breach of the contract."

■ Appellants' second proposition that injunction will not lie at the suit of the union because the contract is one for personal service, which could not be compelled by injunction, and therefore as to that remedy it is lacking in mutuality, is supported by decision in several jurisdictions. We have reached the conclusion, however, that the contract in its collective aspect is not one for personal service. In so far as it may inure to the benefit of the individual members of the union, it does not purport to bind the employers to employ any particular workman, or to continue in the business; nor does it purport to bind any particular workman to work for appellant, or in fact to continue a member of the union, or in the particular line of employment. It does bind the employers, however, to its several terms if they continue in the business; and it becomes a part of the contract of each member of the union on entering the employment of appellant. The right of discharge for any valid reason is not affected by the contract on the one hand; and the right to leave the employment for any valid reason is likewise not affected on the other. The employers and union, its officers and members, are mutually bound by the contract, the former to employ only members of the union in the class of labor specified, pay and observe the stipulated wages and hours of labor, etc.; and the latter to do no act inconsistent with, or obnoxious to, the terms of the contract. They (the union, its officers and members) forego the well-recognized right to strike during the contractual period, to defeat or abridge any stipulation of the collective agreement. As already stated, this implied stipulation of the contract may be enforced by injunction, and we see no valid reason why the same remedy should not be available to the union, if adequate redress may not be otherwise had.

Directly in point, both as to their facts and holdings, are the following cases: Schlesinger v. Quinto; Maisel v. Sigman; Goldman v. Cohen; Ribner v. Rasco, above, by the Appellate Division of the New York Supreme Court; Weber v. Nasser (Cal. App.) 286 P. 1074. We also find a citation to a case decided in 1922 by an inferior court in Ohio, which we have not been able to examine (Leveranz v. Brewing Co., 24 Ohio N. P. (N. S.) 193).

While none of the New York cases reached the court of last resort of that state, we believe their reasoning is sound, and their conclusions follow logically from the holding in Jacobs v. Cohen, above.

A digest of these cases is unnecessary; but as setting forth their holdings we quote somewhat at length from Schlesinger v. Quinto, since it meets squarely the points raised by appellants in the proposition under consideration:

"But, say the appellants, an injunction against the breach of a contract is a negative decree of specific performance of the contract, and the general rule is that the power and duty of a court of equity to grant the former is measured by the same principles and practice as its power and duty to grant the latter. It follows, therefore, that there must be a mutuality of remedy as well as of obligation. * * *

"It is further argued that, because contracts which govern personal relations and regulate personal services, except where the employee's services are unique or extraordinary, will not be enforced in a court of equity, either by direct decree for specific performance or indirectly by a mandatory injunction, therefore there is a lack of mutuality of remedy in this contract. The appellants base their conclusion on the cases holding (1) that an injunction will not issue to compel one man to work for another, although he may have agreed to do so; nor (2) will it restrain him from breaking his contract with A. and entering into the employment of B. unless his services are so unique and extraordinary that another cannot be readily secured to adequately fill his place. The distinguishing feature of those cases and this under consideration is in the principles applicable to each. In the first, the court cannot supervise his work, and has no power against the man's will to make him work; also in the first and second cases, another man can be employed to do the work, and any detriment could be compensated in damages. The instant case does not arise out

of contract for individual employment. Two organizations, one composed of employers and the other of employees, have entered into an agreement. Each had power through the consent of its members to enter into a binding obligation in their behalf. By the constitution or by-laws of each, power is given to the organization to enforce, through disciplinary proceedings which have been demonstrated to be effective, compliance with the terms and conditions to which it has subscribed. This contract has mutual obligations binding on the parties thereto. Each party knows the obligation that it has assumed and the consequences of failure or refusal to perform those requirements. Through its control of its members it can compel performance. Under such circumstances, a decree of a court of equity can be enforced against either party and in favor of the other. Grassi Contracting Co. v. Bennett, 174 App. Div. 244, 248, 160 N. Y. S. 279. An organization, having such power to require performance by individual members, can through its officers be compelled to exercise that power. There is in this contract a mutuality of obligation, and there is also a mutuality of remedy for its enforcement. * * *

"It is urged that, by reason of changes in the expense of living and the condition of unemployment, the terms have become onerous, and the expense of production makes the business unprofitable to the manufacturer. This excuse for the nonperformance of a contract has within the last few years been frequently presented to the courts, but has never been accepted. Unless the parties have stipulated, in terms, for relief because of changed conditions, they must perform their contract as it is written.

"Furthermore, this injunction, by preserving the status quo, prevented the continuance of an industrial impasse, in which the employers were striving to force a change of the contract relations of the parties by a refusal to continue the men in their employ according to the agreement, and the employees were refusing to work, except on the old terms. Experience has shown that such industrial struggles lead to lockouts, strikes, and acts of violence. In the end, one side or the other is compelled to yield through financial exhaustion. Both sides have lost. If the employer is successful, the men return to work embittered. If the employees win, they have inflicted incalculable loss on the employer, and the advantage gained does not offset the loss of wages during the period of the strike. But, above all, the employer and employee, instead of co-operating to promote the success of the industry, become permanently divided into hostile groups, each resentful and suspicious of the other. Therefore, when the employee, instead of resorting to force to secure his rights, an archaic method abandoned by civilized men, seeks

redress in the tribunal constituted by the government to protect its citizens in their rights and redress their wrongs, it is the duty of the court to stop all individual attempts to take the law into their own hands, and compel both parties to await an orderly judicial determination of the controversy."

In the California case a hearing was granted by the Supreme Court and the suit later dismissed because the questions had meanwhile become moot; the order of the Supreme Court reciting that they "neither approve nor disapprove the views announced by the intermediate appellate court."

Appellants contend that this case is not in point, since the opinion states that both parties conceded it was not one calling for personal service. The point was urged, however, that the contract "lacks mutuality of obligation as well as of remedy," counter to which the union contended that the contract was "one of mutual collective bargaining made between the union, a labor organization on the one hand, and the theater owners as employers on the other, whereby terms, conditions, and prices of employment are contracted for by mutual covenants, equally binding upon employers and employees alike and enforceable by both parties; it being mutual in obligation and remedy and supported by a valuable consideration." Quoting further. "In support of their claim that it is a mere nudum pactum, lacking mutuality of obligation and remedy, respondents argue that while they are bound by the contract to employ at their respective theaters an orchestra composed of a specific number of persons who are members of the union, there is no corresponding duty or promise on the part of members of the union to perform services. * * * Notwithstanding that the parties concede that the contract is not one calling for personal services, it is apparent that the question is so entwined and intermingled with contracts of that character it necessitates a discussion of the nature of both such contracts." Weber v. Nasser (Cal. App.) 286 P. 1074, 1076.

We think it clear that appellees have no adequate remedy at law. As we have seen, there were no specific contracts of employment; and no criterion of practical application for ascertaining the damages that would flow from breach of the collective agreement is suggested. If injunction will not lie, the agreement, in so far as it is to the advantage of appellees, is unenforceable, and might as well be classed as merely a moral obligation or "gentleman's agreement," a view which seems to be held by the English courts. Holland .v. London Soc., etc., 40 T. L. R., 440.

In Gregg v. Starks, 188 Ky. 834, 224 S. W. 459, the Kentucky Court of Appeals held that the right of seniority given under a collective bargaining agreement could be enforced at

the instance of a railway conductor by injunction, since there was no ascertainable pecuniary loss arising from the breach, and therefore no adequate legal remedy.

Appellants' third proposition is predicated upon the principle announced in the following quotation from Polk v. Cleveland Ry. Co., 20 Ohio App. 317, 151 N. E. 808, 810: "Contracts by which an employer agrees to employ only union labor are contrary to public policy when they take in an entire industry of any considerable proportions in a community so that they operate generally in that community to prevent or seriously deter craftsmen from working at their craft or workmen from obtaining employment under favorable conditions without joining a union."

Other leading cases upon the subject are Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, and Connors v. Connolly, 86 Conn. 641, 86 A. 600, 45 L. R. A. (N. S.) 564.

The general principle announced in this quotation may be conceded; but we do not believe the record brings the case at bar fairly within its purview.

██ The record shows affirmatively that two of the Austin contractors who employed electrical workers were not parties to the agreement; and that several independent electrical workers, who held contractor's licenses, and who employed other electrical workers when they could not individually perform their entire contracts, were not parties to the agreement. There was no evidence that electrical contractors were the only employers of electrical workers in Austin. We think we may take judicial knowledge of the fact that contractors who engage extensively in building construction do not, like manufacturers, confine their operations to the locality in which their businesses are located, but that there is aggressive competition among such contractors throughout the state, especially where large buildings or plants are erected. Intimation of this is involved in the fact that two of the contractors to the agreement were not Austin concerns, but at the time had Austin contracts; and in the evidence that other outside contractors, should they obtain Austin contracts, would be required to conform to the contract if they employed members of the union.

There is no evidence in the record of any complaint by electrical workers, not members of the union, who failed to obtain employment in Austin by reason of the contract. The record shows, on the other hand, that appellants lived up to the contract for over a year; and that their sole motive for its breach was the fact that, due to changed economic conditions, they found it unprofitable to pay the agreed scale of wages.

The record here does not show any purpose to injure any one, or any other unlawful purpose in entering into the contract; but, to the contrary, that each party was actuated by proper self-interest, to promote which the authorities hold they had a lawful right to contract in the particulars covered by the contract. "Its restrictions were not of an oppressive nature, operating generally in the community to prevent such craftsmen from obtaining employment and from earning their livelihood." Jacobs v. Cohen, above. And to quote further from the same case: "If it might operate to prevent some persons from being employed by the firm, or, possibly, from remaining in the firm's employment, that is but an incidental feature."

In National Fireproofing Co. v. Mason Builders' Association, above, the Circuit Court of Appeals for the District of New York quoted with approval the following from National Protective Association v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648: "The struggle on the part of individuals to prefer themselves, and to prevent the work which they are fitted to from being given to others, may be keen and may have unhappy results in individual cases; but the law is not concerned with such results, when not caused by illegal means or acts."

In the New York case (169 F. 259, 265, 26 L. R. A. (N. S.) 148) it was said: "A laborer, as well as a builder, trader, or manufacturer, has the right to conduct his affairs in any lawful manner, even though he may thereby injure others. So several laborers and builders may combine for mutual advantage, and, so long as the motive is not malicious, the object not unlawful, nor oppressive and the means neither deceitful nor fraudulent, the result is not a conspiracy, although it may necessarily work injury to other persons. The damage to such persons may be serious —it may even extend to their ruin—but if it is inflicted by a combination in the legitimate pursuit of its own affairs, it is damnum absque injuria. The damage is present, but the unlawful object is absent. And so the essential question must always be whether the object of a combination is to do harm to others or to exercise the rights of the parties for their own benefit."

The opinion in Jacobs v. Cohen, above, concludes with this statement: "This contract was voluntarily entered into by the Cohens, and, if it provided for the performance of the firm's work by those only who were accredited members in good standing of an organization of a class of workingmen whom they employed, were they not free to do so? If they regarded it as beneficial for them to do so (and such is a recital of the contract), does it lie in their mouths now to urge its illegality? That, incidentally, it might result in the discharge of some of those employed, for failure to come into affiliation with their fellow workmen's organization, or that it might

prevent others from being engaged upon the work, is neither something of which the employers may complain, nor something with which public policy is concerned." 183 N. Y. 207, 76 N. E. 5, 8, 2 L. R. A. (N. S.) 296, 111 Am. St. Rep. 730, 5 Ann. Cas. 280.

The trial court's judgment is affirmed.

Affirmed.