BENJAMIN SCHLESINGER, as President of the INTERNATIONAL LADIES' GARMENT WORKERS' UNION, and PHILIP KAPLOWITZ, as Treasurer of the JOINT BOARD OF CLOAKMAKERS' UNION OF THE CITY OF NEW YORK, Respondents, *v.* PHILIP QUINTO, Individually and as Treasurer of THE CLOAK, SUIT AND SKIRT MANUFACTURERS' PROTECTIVE ASSOCIATION, and Others, Appellants.

First Department, May 26, 1922.

Injunction — labor unions — action to restrain association of employers from violating contract with unions — original agreement modified but not abrogated by subsequent agreement — facts establish existence of agreement and repudiation by defendants justifying temporary injunction — equity has jurisdiction — no adequate remedy at law — breach of agreement may be restrained — fact that agreement has become burdensome to defendants does not excuse performance.

In an action by labor unions to restrain an association of employers from violating an agreement relating to wages, etc., of members of the unions it appeared that the unions entered into an agreement with the association on May 29, 1919, changing the scale of prices from piece-work to a weekly wage, fixing the minimum scale to be paid to employees, and leaving to the members of the association and the employees in individual cases the right to negotiate and to

pay any sum which they might agree upon above the minimum scale. The agreement recognized that employees of a single employer might strike for a higher uniform wage and also that because a weekly wage was fixed the production might possibly 'decrease. To provide against those contingencies it was provided that the employer might discharge employees for incompetency, etc., and further that there should be no lockout or strike during the period of the agreement, but that if there were a stoppage of work or shop strike, the unions agreed to return the workers, and the agreement contained a provision for the settlement of all complaints, disputes, etc., between the parties. Thereafter, a commission appointed by the Governor made a report in which the minimum wage was increased but not to the point demanded by the unions. That report was accepted by the unions and by the association, but shortly thereafter they became involved in a dispute as to its interpretation and in April, 1921, the association passed resolutions reciting the necessity for the reduction of wages and inviting the unions to confer with it. From the conferences which were held, an agreement was voluntarily entered into by the unions and the association on June 3, 1921, providing for the organization of a joint commission to study shop and labor 'production records and other available data with a view to working out measures which would tend to bring up the productivity of the workers and providing for a report on November 1, 1921, and until that time the commission was, as a joint appeal committee, to pass upon all complaints on the part of the employers and discharged workers arising out of any controversy about the adequacy of productivity. This commission continued to function until the 25th day of October, 1921, when the association adopted a resolution, preceded by a statement that in order to stabilize the industry and to bring about a condition whereby the goods might be manufactured at prices consistent with the times that " there must be a radical readjustment of industrial standards," authorizing the executive committee of the association to determine the extent of reduction of wages and providing that the method of pay should be changed from the week-work system to the piece-work system, and that the number of working hours should be increased and providing that an order should issue binding upon all its members compelling them to conform to the resolution adopted. On November 14, 1921, the members of the association attempted to put the resolution into effect which led to a strike on the part of the workers.

*Held,* that the original agreement of May 29, 1919, was not abrogated by the agreement of June 3, 1921, but that the last agreement was merely supplemental to the original agreement and was not a temporary substitution therefor until a new agreement could be reached, and that the agreement following the report of the Governor's commission simply modified the scale of wages in the original agreement, but otherwise the original agreement was left in full force and effect.

The whole tenor and effect of the agreement of June 3, 1921, was that the commission should deal with the question of production and work out some measure which would tend to bring up the productivity of the workers, fair and proper to both sides.

The resolution by the association on October 25, 1921, was not based on the ground that the agreement of May 29, 1919, had been abrogated or rendered of no effect, by reason of breaches thereof by the unions, but on the sole ground that " there must be a radical readjustment of industrial standards," and said resolution constituted a distinct repudiation of the original agreement.

Whatever conflict there may have been in the affidavits submitted on the motion for the temporary injunction as to the matters prior to the resolution of the association on October 25, 1921, it is clear that the agreement of May 29,

1919, was in force and the parties thereto were operating under it until November 14, 1921, when the association deliberately repudiated it, and so the facts were not in dispute and the court properly refused to deny the injunction on that ground.

It is clear that damages to the individual employees, members of the unions, would not afford an adequate remedy in the present case, and, therefore, a court of equity has the power to interfere and enjoin the doing of a wrongful act.

The breach of a contract between labor unions and an association of employers may be restrained at the instance of the unions, where each of the parties to the contract have full power by consent of their members to enter into a binding obligation, and by the constitution or by-laws of each power is given to the organization to enforce effectively, through disciplinary proceedings, compliance with the terms and conditions to which it has subscribed.

Both the unions and the association through the control of its members can compel performance of the contract, and under such circumstances the decree of a court of equity can be enforced against either party and in favor of the other.

There is in this contract a mutuality of obligation and there is also a mutuality of remedy for its enforcement.

The only mandatory feature about the temporary injunction granted by the court was that it required the association to meet and rescind the resolution of October 25, 1921, but whether or not the association did that is immaterial. inasmuch as the court enjoined it from putting the same into effect.

It is no excuse on behalf of the association for the non-performance of the agreement that by reason of changes in the expense of living and the condition of unemployment, the terms of the agreement have become burdensome and the expense of production makes the business unprofitable to the manufacturer, for unless parties stipulate in terms for relief because of changed conditions they must perform their contract as it is written.

DOWLING, J., dissents, with opinion.

APPEAL by the defendants, Philip Quinto and others, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 16th day of January, 1922, granting plaintiffs' motion for an injunction *pendente lite.*

*Max D. Steuer* of counsel [*Charles H. Tuttle* and *William Klein* with him on the brief], for the appellants.

*Morris Hillquit* [*Samuel Untermyer* of counsel], for the respondents.

PAGE, J.:

The plaintiffs in this action are: (1) The International Ladies' Garment Workers' Union, a voluntary unincorporated association, a national labor union composed of workers engaged by the manufacturers of the women's garment industry in all parts of the United States; it has a membership of about 150,000 and is affiliated with the American Federation of Labor; (2) The Joint Board of Cloakmakers' Union of the City of New York, a delegated body

composed of representatives of all local unions in the city of New York whose members are employed in the different branches of the cloak making industry; it is affiliated with the International Ladies' Garment Workers' Union, and is a part of that organization. These two organizations will hereafter, for the sake of brevity, be collectively designated as the Union.

The defendant, The Cloak, Suit and Skirt Manufacturers' Protective Association, is also a voluntary, unincorporated association of employers engaged in the manufacture of the garments indicated by its name, representing about 280 firms, or corporations, who employ, collectively, about one-half of all the workers in the industry in the city of New York, either directly or through contractors working for them. This organization will be designated as the Association.

The Union and the Association made collective agreements with each other, with the authorization and on behalf of their respective members, in 1910, 1915, 1916 and 1919, whereby was established the scale of wages, hours of labor and other conditions of employment, with provisions for the creation and maintenance of a tribunal for the adjustment of disputes between employers and workers and the Association and the Union. According to the papers submitted on the motion herein, these agreements would seem to have been " more honored in the breach than in the observance," each side charging the other with responsibility. These contracts have generally been preceded by strikes, lockouts and other tactics of industrial war, and thus have been the result rather of terms dictated by necessity arising from exhaustion, than of a deliberate consideration of economic conditions, and a mutual accommodation to the rights and obligations of employer and employee. This has engendered a feeling of distrust and hostility that has militated against the strict observance of contract obligations, and been disastrous in the prosecution of the industry both to employer and employee. Prior to the making of the agreement of May 29, 1919, compensation was fixed by a scale of prices for piece work. In this agreement the scheme of compensation was changed to a weekly wage. The wages to be paid to the employee in each branch of the work was not definitely fixed, but a minimum scale was adopted, thus leaving to the manufacturer and the employee, in each individual case, the right to negotiate for and to pay any sum which they might agree upon above the minimum scale. It was thus intended to allow the employer to give a higher compensation to the more skillful worker, while placing a limit below which the more incompetent could not be reduced. Two possible results of this plan were anticipated and in the agreement sought to be

safeguarded: *First*, that the employees of a single employer might combine, and by means of a shop strike compel the payment of a higher uniform wage to all the employees irrespective of their competency; *second*, that, the incentive to increased production being removed, when compensation was no longer based on the piece price, but was fixed at a weekly wage, the employees would reduce their production by " soldiering on the job," as it was expressed in the agreement. The agreement provided with respect to the second of these dangers: " The Union, believing in the principle of a ' fair day's labor for a fair day's pay,' obligates itself in all good faith for all its members, that they will perform their work conscientiously, faithfully and efficiently." And to further secure the employer, a clause was inserted reading as follows: " The employer may discharge his workers for causes such as incompetency, misconduct, insubordination in the performance of his work, breach of the reasonable rules to be established, and soldiering on the job." To guard against the first the contract provided: " There shall be no lock-out or strike in the shops during the period of this agreement nor shall there be any individual shop lock-out, stoppage or shop strike pending the determination of any complaint or grievance. Should there be a stoppage of work or shop strike in any factory, immediate notice thereof shall be given by the Association to the Union. The Union agrees to return the striking workers to their work within twenty-four hours after the receipt by the Union of such notice, and until the expiration of such time it shall not be deemed that the striking workers have abandoned their employment. The consideration of stoppage cases shall have precedence over all other complaints and grievances arising hereunder." The agreement contained a provision for the settlement of all complaints, disputes or grievances, arising between the parties thereto, by the manager of the Association and the manager of the Union or their deputies, their decision to be binding on the parties. Should the managers fail to agree, the matter was to be referred to a trial board consisting of one member from each organization and an impartial person selected from a list of names previously agreed upon by the Union and the Association. The decision of a majority of this board is to be final and binding.

The rapidly increasing cost of living during the period of the agreement led the workers in nearly all industries to apply for and obtain wage increases. The workers in the cloak industry made an application for an increase in the minimum wage scale in the month of November, 1919. The employers refused to consider the request. The controversy was carried on in the public press, and was inevitably leading to a renewal of strife, with the usual concomitants of

strikes and lockouts, when the Governor of the State intervened and invited both parties to a conference with him. As a result of this conference the Governor appointed a commission consisting of seven members, upon which the Union and the Association were represented. This commission made as one of its first recommendations that all workers who were on strike should be returned to work at their respective shops. Immediately all workers who had been engaged in shop strikes returned to work. The Governor's commission held public hearings and granted an increase in the weekly wage schedule, which was less than that demanded by the workers. The report of the commission was unanimous and was accepted by the workers and the employers. In this report it stated:

"A collective bargaining agreement calls for the utmost good faith on both sides to perform both in letter and in spirit, every term and condition thereof; whether it refers to shop strikes on the part of the worker, lock-outs on the part of the employers, or the maintenance of its terms as to wages and hours. This Board desires to emphasize this point as fundamental in any contractual relationship, and has endeavored to hold the existing contract inviolate in any adjustment it has made of the present difficulty.

" The Board has unanimously agreed upon a wage increase to be given to the workers based upon the belief that it is called for by certain conditions inherent in the industry, and that it will make for harmony throughout the season. It is the opinion of the Board that it will stabilize the industry if neither side will take advantage of seasonal pressure at any time to force changes in the established schedules."

Shortly after the report was accepted the Union and the Association became involved in a dispute as to its interpretation, the Association claiming that it was a temporary increase granted to those who were employed in January, 1920, and not applicable to those who became employees after that date, and as to all employees was subject to revision if and as the cost of living should become less; the Union on the other hand claimed that the increase granted was a revision of the scale of weekly wage in the agreement. That the commission did not base its findings alone on the increased cost of living, and that it did not intend the increase granted to be only temporary, clearly appears from the excerpt from the report above set forth. This difference of opinion as to the construction of the commission's report led to demands and counter demands, and to shop strikes, when changes were attempted in the wage schedule, some of which were directed against non-members of the Association who had been proposed for membership. There was a pro-

vision in the agreement that, before accepting a new member, the Association should inform the Union, in writing, of the application, and if a strike or dispute should be pending between the applicant and the Union at the time, the Union was to give the Association full particulars, in writing, of the nature of the dispute, and that the Association might undertake to adjust the dispute in accordance with the terms of the agreement. It is charged that these latter strikes were called for the purpose of preventing an increase in membership of the Association pending a settlement of the dispute as to the construction of the report of the Governor's commission, and not because of any real grievance. This is denied by the affidavits submitted by the plaintiffs.

In April, 1921, the position became acute, and the Association adopted a preamble reciting that the increases in pay granted from time to time were granted on condition that production was to have been accelerated, but that in fact it had been retarded, and the workers, instead of turning out a maximum of · production, produced but a minimum, and that the emergency then existing for such increases having passed, the executive committee of the Association had given deliberate consideration to the readjustment of conditions and reached the conclusion that a reasonable degree of stability in the industry could only be obtained by a definite reduction of production cost; and that to accomplish that purpose it concluded that there should be: (1) A uniform reduction of wages; (2) an increase in the number of working hours in the week; (3) the exercise of the right of the employer to select and retain those employees who were best suited to his factory. It was resolved " that the Ways and Means Committee of this Association be and it hereby is directed to formulate and carry into effect with all possible speed a policy, which, in its judgment and discretion as to method and procedure, be deemed best calculated to carry out the intent of this Resolution." On April 22, 1921, the Association by letter notified the Union of the action taken and offered to it the opportunity of conferring with its committee for the purpose of providing means for correction of the abnormal conditions that then prevailed. The Union accepted the proposition in a letter wherein it was stated that a conference committee had been appointed, and that they disagreed with the Association that the high rate of wages and the non-productivity of the workers was the cause of the high selling price, and stated, " Our Unions have always considered it the duty of workers to give a fair day's labor in return for a fair wage and will willingly co-operate in any just and reasonable device for the application of that principle. Hoping that good will result from our proposed conference alike to the employers and workers

in our industry." From the conferences which were held, an agreement was voluntarily entered into by the parties hereto in June, 1921.

This agreement provided for the organization of a joint commission, consisting of three members of the Association and three members of the Union, to study shop and labor production records and other available data with a view to working out measures which would tend to bring up the productivity of the workers to a point fair and proper to both sides, the commission to make a final report with complete and appropriate recommendations on November 1, 1921; until which time the commission was, as a joint appeal committee, to pass upon all complaints on the part of the employers and discharged workers, presented to it by the Unions or the Association, arising out of any controversy or dispute about the adequacy of productivity. This commission was organized and continued to function until on the 25th day of October, 1921, when the Association, at a meeting attended by practically all its members, adopted the following resolutions:

" WHEREAS, it is the opinion of the executive committee, that in order to stabilize and bring into the industry a condition under which garments may be manufactured efficiently and at prices consistent with the times, that there must be a radical readjustment of industrial standards, therefore it is

" *Resolved*, That it has become necessary to substitute in the industry the piece work system for the week work system, to establish an increase of the number of working hours in the week and to fix a reduction of the wages of the workers in those branches of the industry where, by the nature of the services rendered it is required that they be retained on the week work system; and be it further

" *Resolved*, That the extent of the reduction of the wages of the week workers and the number of hours to be added to the working week be determined by the executive committee, and further be it

" *Resolved*, That in order to bring into full force and effect the above changes in the industrial standards of the industry, there be promulgated an order, binding upon every member of this association, that, beginning Monday, Nov. 14, 1921, each and every member will operate his factory on the piece work system and at the scale of wages and for the working week established by the executive committee."

The proposition to return to the piece-work system, a reduction of wages, and an increase in the working hours had been suggested by the representatives of the Association at a meeting of the joint commission on October 17, 1921, and the representatives of the

Union had refused to entertain or even discuss the proposition. Therefore, the adoption of the resolution of October twenty-fifth was with full knowledge that its enforcement would meet with determined opposition on the part of the Union. On November 14, 1921, the members of the Association attempted to put the resolution of October twenty-fifth into effect, which led to a strike on the part of the workers. And thus another industrial warfare between employer and employee, which has been financially so disastrous in the past to both parties, was commenced.

On November 29, 1921, this action was commenced by the Union against the Association and various members thereof for an injunction restraining it from putting into effect the resolution of October twenty-fifth, or from disciplining any of its members that might agree with the Union to resume work under the contract of May 29, 1919, and requiring the Association to abrogate the said resolution and to cease acting thereunder, and restraining it from taking any concerted action involving the violation or repudiation of the agreement of May 29, 1919, or any of the terms thereof. A preliminary injunction of like tenor and effect was demanded. An order to show cause why such an injunction should not be granted *pendente lite* was issued and voluminous affidavits were submitted. On January 16, 1922, the injunction order was granted, from which this appeal was taken. Since the granting of the temporary injunction, the parties have conducted their business in accordance with the agreement of May 29, 1919, as modified by the acceptance of the recommendations of the Governor's commission.

The appellant contends that the agreement of May 29, 1919, was abrogated; that the agreement of June 3, 1921, was not supplemental to the agreement of May twenty-ninth, but was a temporary substitution therefor until a new agreement could be reached. In my opinion neither of these contentions is sound. The agreement certainly was never abrogated by mutual consent. As has been stated before in this opinion, the change made in the recommendation of the Governor's commission was a modification of the scale of wages established by the agreement of May 29, 1919; but otherwise that agreement was left in full force and effect. It may be that the demand for an increase in the scale of wages was an act in contravention of the agreement, and if persisted in after refusal, would have justified a termination of the contract. An investigation of the demand of the Union was had, and by mutual consent the contract was modified, not temporarily, as claimed by the appellants, but for a period coextensive with the term of the contract. The agreement of May 29, 1919, while fixing a minimum

wage scale, left to individual negotiation the actual wage to be paid. This gave cause for the old method of settling a dispute between employer and employee as to compensation, and led to shop strikes by individual workers against their employer, and introduced an element of friction between the parties to the contract, and is the basis of charges and countercharges of lack of good faith; but the parties continued to act under and in performance of the contract. A second element of weakness in the contract was the lack of a standard of production. While the contract proclaimed the principle of " a fair day's work for a fair day's pay," and fixed a minimum of pay, it did not fix a minimum standard of production by which a fair day's work could be judged.

The incentive to production under the piece-work system, where the compensation was measured by productivity, was removed. The pay was secure, irrespective of the amount of work performed. It was but natural, and was anticipated, that in so large a number of workers, some would take advantage of the situation and " soldier on the job." The safeguards against this, provided in the agreement of May 29, 1919, proved inadequate. It was because of this situation, which the officers of the Union appreciated, that the joint commission was appointed pursuant to the agreement of June 3, 1921. The whole tenor and effect of that agreement was that the commission should deal with the question of production and work out some measure which would tend to bring up the productivity of the workers to a point fair and proper to both sides. This joint commission was not to take the place of the trial board provided for in the agreement of May twenty-ninth; only those controversies arising over questions of the adequacy of production were to be referred to the joint commission. On the face of the agreement it is clear that the purpose of this agreement was not substitutional, but supplementary to that of May twenty-ninth. It was an endeavor, at least on the part of the representatives of the Union, to devise means for covering a defect in the original agreement.

As has been stated, as early as April, 1921, the Association adopted resolutions looking to the abrogation of the agreement of May twenty-ninth, and the establishing in the place thereof an entirely new agreement providing for a reduction in wages and an increase of the number of working hours in the week. When the joint commission met, the representatives of the Association presented as a *sine quo non*, that a new agreement should be made returning to the piece-work system, when practicable, reducing the wages of those employed on the week-work system, and an increase in the hours of labor; and when the representatives of the Union

refused, the Association passed the resolution hereinbefore set forth, in full, which gave effect to the purpose declared in the preceding April. This resolution of October 25, 1921, was a distinct repudiation of the agreement of May 29, 1919, a refusal to be further bound by it, and provided effective means for compelling all its members to break that agreement. When the resolution became effective and was enforced on November 14, 1921, the breach of the agreement on the part of the Association was complete. It is to be noted that neither in the preamble nor in the resolutions is the statement made that the agreement of May twenty-ninth had been abrogated or rendered of no effect by reason of breaches thereof by the Union. The sole ground is that " there must be a radical readjustment of industrial standards." That is, one party to the contract found its conditions burdensome and hence elected to break it, and this at a time when a joint commission was in existence, selected by both parties to the contract, for the purpose of investigating the alleged grievances and recommending a modification of one provision in the contract, or adopting measures to make that one provision effective. Without attempting in good faith to seek a solution of the disputed questions or to remedy the defect, before the time for the commission to report had expired, the Association definitely repudiated the agreement and took effective means to impose its will upon the industry. Whatever conflict there may be in the affidavits submitted on the motion for the injunction, as to matters prior to the action of the Association on October 25, 1921, it is clear that the agreement of May 29, 1919, was in force and the parties thereto were operating under it until November 14, 1921, when the Association deliberately repudiated it. These considerations dispose of the appellants' argument that the court should have denied the injunction because the facts were in dispute.

The agreement of May twenty-ninth, while providing certain standards of compensation, left to the individual employer and employee the right to contract for the weekly wage to be paid. The resolution of October 25, 1921, required, under the penalty provided in the by-laws of the Association, that the employers break these agreements with their employees. It has been repeatedly held that when a person knowingly and intentionally interferes with an express contract between two persons, and induces one of them to break that contract, the party injured can maintain an action against the wrongdoer. (*Posner Co.* v. *Jackson*, 223 N Y. 325, 326; *Lamb* v. *Cheney & Son*, 227 id. 418, 421.) Such an action is usually to recover damages, because damages ordinarily

32

afford an adequate remedy for the wrong done. But it is well settled that where a wrong is threatened and damages would not afford an adequate remedy, a court of equity will interfere and enjoin the doing of the wrongful act. It is clear that damages to the individual employee would not afford an adequate remedy in the case under consideration.

The cases thus far decided have been at the suit of the employer against combinations of labor, for the simple reason that this is the first time that labor has appealed to the courts. The principles of law on which they were decided are applicable to a combination of employers who by coercive measures seek to break contracts between employer and employee. The remedies are mutual; the law does not have one rule for the employer and another for the employee. In a court of justice they stand on an exact equality; each case to be decided upon the same principles of law impartially applied to the facts of the case, irrespective of the personality of the litigants.

But, say the appellants, an injunction against the breach of a contract is a negative decree of specific performance of the contract, and the general rule is that the power and duty of a court of equity to grant the former is measured by the same principles and practice as its power and duty to grant the latter. It follows, therefore, that there must be a mutuality of remedy as well as of obligation. (*Star Co.* v. *Press Pub. Co.*, 162 App. Div. 486, 488; *Shubert* v. *Woodward*, 167 Fed. Rep. 47; *Wadick* v. *Mace*, 191 N. Y. 1, 5; *Mutual Life Ins. Co.* v. *Stephens*, 214 id. 488, 496.) This is a correct statement of the law. It is further argued that because contracts which govern personal relations and regulate personal services, except where the employee's services are unique or extraordinary, will not be enforced in a court of equity either by direct decree for specific performance or indirectly by a mandatory injunction, therefore, there is a lack of mutuality of remedy in this contract. The appellants base their conclusion on the cases holding (1) that an injunction will not issue to compel one man to work for another, although he may have agreed to do so, nor (2) will it restrain him from breaking his contract with A and entering into the employment of B, unless his services are so unique and extraordinary that another cannot be readily secured to adequately fill his place. The distinguishing feature of those cases and this under consideration is in the principles applicable to each. In the first, the court cannot supervise his work and has no power against the man's will to make him work. Also in the first and second cases, another man can be employed to do the work, and any detriment could be compensated in damages. The instant

case does not arise out of contract for individual employment. Two organizations, one composed of employers and the other of employees, have entered into an agreement. Each had power through the consent of its members to enter into a binding obligation in their behalf. By the constitution or by-laws of each, power is given to the organization to enforce through disciplinary proceedings which have been demonstrated to be effective, compliance with the terms and conditions to which it has subscribed. This contract has mutual obligations binding on the parties thereto. Each party knows the obligation that it has assumed and the consequences of failure or refusal to perform those requirements. Through its control of its members it can compel performance. Under such circumstances, a decree of a court of equity can be enforced against either party and in favor of the other. (*Grassi Contracting Co.* v. *Bennett,* 174 App. Div. 244, 248.) An organization, having such power to require performance by individual members, can through its officers be compelled to exercise that power. There is in this contract a mutuality of obligation, and there is also a mutuality of remedy for its enforcement.

The appellants continually refer to this as a mandatory injunction. The only mandatory feature is that which required the Association to meet and rescind the resolution of October 25, 1921. Inasmuch as the court enjoined the Association from putting the same into effect, or proceeding under it, whether it remained on the minute book of the organization or was rescinded, made little difference. It was a *brutum fulmen.* The injunction merely required that the defendants should not break their contract under which the parties had conducted their affairs for two years and six months, to the end that the relations under the contract might continue until the trial of the action. The term of the contract would expire in six months. The defendants were not required to do anything that they had not agreed to do, nor were they prohibited from doing anything that they had a right to do under the contract. The liberty of the employer to make agreements with his employees as to compensation was preserved subject only to the limits voluntarily assumed by the terms of the agreement.

Is is urged that, by reason of changes in the expense of living and the condition of unemployment, the terms have become onerous, and the expense of production makes the business unprofitable to the manufacturer. This excuse for the non-performance of a contract has within the last few years been frequently presented to the courts, but has never been accepted. Unless the parties have stipulated, in terms, for relief because of changed conditions, they must perform their contract as it is written.

Furthermore, this injunction, by preserving the *status quo*, prevented the continuance of an industrial *impassé*, in which the employers were striving to force a change of the contract relations of the parties by a refusal to continue the men in their employ according to the agreement, and the employees were refusing to work except on the old terms. Experience has shown that such industrial struggles lead to lockouts, strikes and acts of violence. In the end one side or the other is compelled to yield through financial exhaustion. Both sides have lost. If the employer is successful, the men return to work embittered. If the employees win, they have inflicted incalculable loss on the employer, and the advantage gained does not offset the loss of wages during the period of the strike. But above all, the employer and employee, instead of co-operating to promote the success of the industry, become permanently divided into hostile groups, each resentful and suspicious of the other. Therefore, when the employee, instead of resorting to force to secure his rights, an archaic method abandoned by civilized men, seeks redress in the tribunal constituted by the government to protect its citizens in their rights and redress their wrongs, it is the duty of the court to stop all individual attempts to take the law into their own hands, and compel both parties to await an orderly judicial determination of the controversy.

The order should be affirmed, with ten dollars costs and disbursements.

CLARKE, P. J., SMITH and GREENBAUM, JJ., concur; DOWLING, J., dissents.

DOWLING, J. (dissenting):

I dissent from the affirmance of this order upon the following grounds:

(1) The plaintiffs have not made out a sufficient case for the granting of a preliminary injunction; practically every important allegation made by them is controverted by defendants, and they are, therefore, not entitled to temporary relief which not only grants them all they ask by their prayer for judgment, but even more. Injunctions which give all that could follow a trial of the issues should be granted only in cases of real necessity.

(2) Even upon the plaintiffs' proofs, a doubt exists as to their right to temporary relief.

(3) The court will seldom grant an injunction *pendente lite* unless the plaintiff's rights are so clear that a denial of the right would be either captious or unconscionable; in the case at bar, the plaintiffs' rights to relief, either temporary or permanent, are far from clear.

(4) There is no mutuality of remedy under the conditions disclosed by the record. The defendants could not compel the performance by court order of the covenants made by the employees.

(5) Contracts for the rendition of personal services will not be enforced by mandatory injunction. Injunctive relief to prevent the rendition of services for others in violation of a contract will only be granted where the services are unique and extraordinary. In all other cases the remedy is not in equity but by a suit for damages.

(6) It is sought by the injunction to enforce an agreement between the parties, the very existence of which at the time of bringing the action is denied, an agreement which had been violated or treated as abandoned by both parties thereto, and the responsibility for the breach of which is open to serious doubt, if indeed both did not equally break and disregard it. Certainly plaintiffs have failed to show that they were without fault in the situation which has arisen.

(7) The plaintiffs admit in their complaint that they have been conducting a strike against their employers; upon all the proofs presented, they do not come into court with clean hands.

(8) Plaintiffs have an adequate remedy at law.

(9) The general rule is that an injunction will not lie to compel an employer to refrain from breaking his contract with his employee, even though such action is a direct violation of the contract; the remedy of the employee at law for damages is adequate and complete. (See *Schwartz* v. *Wayne Circuit Judge,* 217 Mich. 384; *sub nom. Schwartz* v. *Driscoll,* 186 N. W. Rep. 522.)

(10) If power is to be given to the courts to interfere in industrial disputes, to determine the responsibility for their existence and to declare who is in the right therein, as well as to enforce performance of contracts for services by mandatory injunction against either employers or employees, the grant of such power should be by legislative action alone. The wisdom of such a grant of power has heretofore been vigorously denied, particularly by the representatives of the employed, who have earnestly protested against any power being given to the courts to compel workmen to perform any specific kind of service, as abrogating guaranteed rights.

Order affirmed, with ten dollars costs and disbursements.