MISSISSIPPI THEATRES CORPORATION *et al. v.* HATTIESBURG LOCAL UNION No. 615.

(Division A. Jan. 6, 1936. Suggestion of Error Overruled Feb. 3, 1936.)

[164 So. 887. No. 31970.]

Luther A. Smith, of Hattiesburg, for appellants.

James E. Coughlin and T. Price Dale, both of Hatties-
burg, for appellee.

Argued orally by **L. A. Smith**, for appellant, and by **T. Price Dale**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The Hattiesburg Local Union No. 615, International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, filed its bill in equity against the Mississippi Theatres Corporation, Al H. Yeomans, L. J. Brown, and Louis J. Hammack, in which an injunction was sought by the local union to compel the appellants to continue in its employment members of its union who were ready, willing, able, and competent to perform the services required under a written contract entered into by the parties appellee and appellant. The written contract between the Mississippi Theatres Corporation, the employer and the local union, representing the employees, was executed on the 13th day of May, 1935, and was to continue in force until May 13, 1936. By this contract the Theatres Corporation agreed with the local union to employ "only those stage and moving picture employes and machine operators supplied by the local union;" and further provided for the scale of wages for the various classes of employees, and for working conditions.

The local union agreed, on its part, to furnish competent men to perform work as required by the employer; and it was stipulated that the employer could terminate its contract with any individual upon two weeks' notice; the same privilege being granted to the individual employee.

The bill charged that at the time of the execution of the contract, and ever since, the local union has had, and continues to have, competent moving picture machine operators with whom to fulfill and carry out its part of the contract, and at all times was ready, willing, and anxious to carry out its contract by having available the men called for in the contract, and that for a short

time it was carried out by both parties; but that prior to the filing of the bill the employer refused to employ competent moving picture operators, instead employed others not furnished by the local union, and had discharged all the men so furnished by it.

The bill further charged that the Theatres Corporation had on June 4, 1935, entered into what purported to be a lease contract with L. J. Brown and Louis J. Hammack, whereby the said corporation pretended to lease to the said individuals its theater building in Hattiesburg, and whereby the lease contract pretended to give the said Brown and Hammack the right and power to discharge and hire whomsoever they chose.

It was further charged that the lease contract was not bona fide, not being made for the purpose of leasing the theater to said Brown and Hammack, but for the sole purpose of enabling the Theatres Corporation and Yeomans to refuse to carry out their contract so entered into with the complainant; and, further, that the Rose Theatre in Hattiesburg was being operated in this manner in the name of Brown and Hammack, and that the employers declined to re-employ the discharged operators or any others whom the complainant might have furnished for the work, as provided.

It was further charged that under the terms of the contract the employer was not forced to keep in its employ any person furnished by the union where the employer, for any reason, preferred not to do so.

It is alleged by the union that it had no adequate remedy at law; that it could not recover as damages the salaries of the individuals which it was obliged to furnish under the contract; and that no individual member of its union could recover, for the reason that it could not assert that any particular individual would have the right to sue for damages on account of wages, because of the power granted in the contract to the employer to discharge at will, on two weeks' notice, any individual furnished by the local union.

The bill prayed for a temporary mandatory injunction, to be made perpetual on final hearing, requiring the employer to carry out its contract by re-employing its members. A temporary writ of injunction on the fiat of the chancellor was issued and served, requiring the employers named immediately to re-employ, and to continue to employ until the cause could be heard on its merits, operators for the moving picture machine in the Rose Theatre in the city of Hattiesburg to be furnished by the union under the contract, which was made an exhibit to the bill.

The above-named employers appeared and filed their demurrers to the bill on the principal ground that there was no equity on the face of the bill, and filed therewith a motion to dissolve the injunction; and the cause was heard on the pleadings. The court below overruled the motion to dissolve the injunction, and declined to allow an appeal to settle the principles of the case; and the cause is now here upon an order made by a member of this court; the appeal being granted to settle all the controlling principles thereof, with supersedeas.

1. The principal assignment of error is that the court below erred in granting an injunction in this case, because a court of equity will not decree the specific performance of a contract for the rendition of personal services. In the cases of Sims v. Vanmeter Lbr. Co., 96 Miss. 449, 51 So. 459, and Chambers et al. v. Davis et al., 128 Miss. 613, 91 So. 346, 22 A. L. R. 114, this court followed the rule generally recognized by the courts, that equity will not decree the specific performance of a contract for personal services. In the latter case certain brakemen sought by a bill in equity to have their seniority rights, as such, enforced by a court of equity; these rights having been secured to them by a contract between their union and the railroad company. Both of these cases, however, were instituted by individuals who sought to have their employment continued and a specific performance of the contract for personal services. These

suits were not instituted by the labor union, seeking to have its contract with the employers specifically performed.

However, injunctions have been refused, in cases not differing in their essential facts from the case at bar, at the instance of labor unions, on the ground that equity would not enforce contracts for personal services where the services to be performed were neither unique nor extraordinary. As an example see Schwartz v. Wayne, Circuit Judge (Schwartz v. Driscoll), 217 Mich. 384, 186 N. W. 522, and Stone Cleaning & Pointing Union v. Russell, 38 Misc. 513, 77 N. Y. S. 1049. This latter case, decided by the New York Supreme Court in July, 1902, held that an injunction will not lie to restrain breach of contract to employ only members of an employee's union; the employment not being unique or extraordinary.

Subsequently, the New York Court, Appellate Division, had before it the case of Schlesinger v. Quinto, 201 App. Div. 487, 194 N. Y. S. 401, in which it held that damage to the individual employees, members of a union, would not afford an adequate remedy therein to the union itself, and therefore a court of equity had power to interfere and enjoin the breach of contract with the union to employ only its members; that the union or association, by its control of its members, can compel their performance of its contracts. Under such circumstances, the decree of the court can be enforced against either party for the benefit of the other; that there was mutuality of obligations, and also mutuality of remedy for the enforcement thereof. Mr. Justice Dowling dissented, relying upon the general rule to which we have adverted, citing the Schwartz case, supra.

At a later date, in the case of Ribner v. Rasco Butter & Egg Co., Inc., 135 Misc. 616, 238 N. Y. S. 132, 136, on facts not essentially different, that court said: "It is well settled that an employer may avail himself of the

relief afforded by a court of equity to enforce his rights under such a contract with a labor union. Conversely, the union should be afforded reciprocal relief to enforce its rights under the contract with the employer. I find this view sustained by later authority in the cases of Schlesinger v. Quinto, 201 App. Div. 487, 194 N. Y. S. 401, 409, and Goldman v. Cohen, 222 App. Div. 631, 227 N. Y. S. 311, 313, both of which were decided nearly a quarter of a century after the case of Stone Cleaning & Pointing Union v. Russell, supra.''

And the Ribner case further quotes as follows: ''The cases thus far decided have been at the suit of the employer against combinations of labor, for the simple reason that this is the first time that labor has appealed to the courts. The principles of law on which they were decided are applicable to a combination of employers who by coercive measures seek to break contracts between employer and employee. The remedies are mutual; the law does not have one rule for the employer and another for the employee.''

In this case it was further stated that: ''The plaintiff in the instant case seeks like relief, namely, that the defendant be restrained from breaching the contract under which the defendant agreed to employ only members of the plaintiff union in good standing for one year from the 29th day of March, 1929. I am of the opinion that equity affords the only adequate remedy in the premises. The injury is irreparable and continuous. To deny to the plaintiff union the right to invoke the aid of a court of equity to prevent an unlawful violation of its contract, it must necessarily follow that the right of collective bargaining will be seriously impaired, leaving the labor union to resort solely to strikes and picketing, which would entail, not only serious financial loss, but also protracted and needless friction and possible breaches of the public peace and security. . . . Legislatures and courts recognize the right of labor unions to enter into

lawful contracts on behalf of their members with the employer for the purpose of promoting the welfare of their members, and in furtherance thereof such agreements should be clothed with legal sanction and afforded the mutual protection of the law. It is in the interest of good government that labor unions and employers should be afforded this reciprocal protection in their lawful contractual undertakings. . . . Under the terms of the contract here presented there is mutuality of obligation. There should be mutuality of remedy. The contract is valid. The power of a court of equity to issue an injunction to prevent such alleged violation is well established.''

Upon the same reasoning the appellate court of Texas adopted the view that a union might have an injunction such as was granted in the case at bar. See Harper v. Local Union No. 520 (Tex. Civ. App.), 48 S. W. (2d) 1033. Our own court has declared itself in no uncertain terms as to the enforcement of the principle of collective bargaining, in the case of Y. & M. V. R. Co. v. Sideboard, 161 Miss. 4, 133 So. 669. It is now the deliberate conclusion of economists and employers of labor that collective bargaining, that is, the entering into contract for labor with employers by a union through its representatives, is helpful, and advances the general public welfare, in that boycotts, lock-outs, strikes, picketing, and attendant evils, can best be avoided by recognition of the principle. Where then would be the benefit to the union of having the principle of collective bargaining granted in name, while it is entirely without any remedy against an employer who had entered into a valid contract to employ only its members, competent, willing, and ready, and who then violates this contract? Under such conditions, the contract would be, in deed and in truth, a mere scrap of paper. The members of the union would feel contempt for the manager of a union who was thus helpless. The discipline which the union authorities enforce upon its

members is thought to be beneficial to society and to the employers of labor. All of the prestige and power of the labor unions, as such, are destroyed if their contracts may be disregarded by a court of equity, leaving it without remedy. It is not an attempt to force the employer to continue in service any particular individual. In that sense it is not personal service, it is the service of a mass of employees; if one is unsuitable and incompetent, then the union is prepared to furnish another who is satisfactory. In order to maintain the principle of collective bargaining, and to preserve the rights of each party to the contract, it is essential that on breach of contract, such as is alleged here, a court of equity should not be powerless and its arm should not be shortened to prevent its affording relief. The prestige and authority of the labor union to enforce obedience to its contracts, entered into with the employer, must be recognized. Otherwise, a suit for damages on the part of the union would be met immediately with the proposition that it had lost no specific amount by the breach of the contract; that it had not contracted to furnish a particular individual to render personal service. "Personal" means "appertaining to the person; belonging to an individual; limited to the person." See Black's Law Dictionary. "Service, the being employed to serve another; duty or labor to be rendered by one person to another, the former to submit his will to the direction and control of the latter." Black's Law Dictionary. "Service, the act of serving; the labor performed or duties required." 57 C. J. 275, 276. The labor union itself toils not, neither does it spin; it performs no personal service; it offers to supply a particular class of labor to the employer, who, believing a contract with it to be of benefit or profit, enters into a contract with it to employ only the laborers furnished by the union. The situation is analogous to an employment agency, contracting with employers to supply laborers suitable to perform their work, and competent to render that service.

2. The allegations in the bill sufficiently show that the parties named have entered into a fraudulent conspiracy to defeat the enforcement of this contract, which may be difficult to prove, but is a sufficient allegation to withstand a demurrer. It charges, in effect, that the lease contract was a mere sham; a shield for the breach of the contract.

The motion to dissolve the injunction was properly overruled.

No other question is decided save those which have been presented in the argument, and decided by us in this opinion.

Affirmed.