JOHN DeLURY, as President of the Uniformed Sanitationmen's
Association, Local 831, I.B.T., et al., Respondents, v CITY
OF NEW YORK et al., Appellants.

First Department, July 11, 1975

*Stanley Buchsbaum* of counsel *(Leonard J. Koerner, Joseph
Bruno* and *Kenneth Wolfe* with him on the brief; *W. Bernard
Richland, Corporation Counsel),* for appellants.

*Charles G. Moerdler* of counsel *(Vivienne W. Nearing* with
him on the brief; *Stroock & Stroock & Lavan,* attorneys), for
respondents.

*Per Curiam.* This is an appeal from an order of the Supreme Court, Special Term, New York County (TYLER, J.), which was entered on June 27, 1975, granting a preliminary injunction enjoining and restraining the defendants from: (1) dismissing or separating from employment in any way any person who was, on July 1, 1974, employed and who, at the time of the commencement of this action, June 17, 1975, continued to be employed in the title of sanitationman, except for good cause, and, in accordance with law; and (2) violating or breaching in any way the terms and conditions of the agreement entered into as of July 1, 1974, between the City of New York and the Uniformed Sanitationmens' Association, Local 831, I.B.T. The order further provided that plaintiffs' undertaking be fixed in the sum of $1,000,000, on the condition that the plaintiffs, if it is finally determined that they were not entitled to injunctive relief, pay to the defendants all damages and costs which may be sustained because of the injunction.

Prior to the argument of this appeal, this court, by a majority vote, had denied a motion by the plaintiffs-respondents to vacate the statutory stay (CPLR 5519, subd [a], par 1) of the temporary injunction issued below *(DeLury v City of New York,* 48 AD2d 405). An examination of the court's opinion, rendered on that motion, discloses that much of it applies to the resolution of the questions presented on this appeal.

In any situation where an application is made for a temporary injunction, it is clearly established law that the applicant must demonstrate a clear legal right to the relief sought and, further, that the denying of the relief sought would result in irreparable injury to the applicant. As was stated in *De Candido v Young Stars* (10 AD2d 922): "A temporary injunction should not be granted unless the plaintiff shows a clear legal right thereto and, in addition, shows that he would be irreparably damaged if an injunction were not granted before trial". (Also, see: *Barricini v Barricini Shoes,* 1 AD2d 905; *Park Terrace Caterers v McDonough,* 9 AD2d 113.)

In this last-cited case this court, in reversing so much of an order of Special Term as granted a temporary injunction restraining a union from picketing the premises of plaintiffs, said (p 114): "The drastic remedy of temporary injunction is not to be granted unless a clear right to the relief demanded is established upon the moving papers. The burden of estab-

lishing such an undisputed right is upon plaintiff [citing cases]."

Again, in *Cohen v Department of Social Servs. of State of N. Y.* (37 AD2d 626, affd 30 NY2d 571), an order enjoining the defendants from, amongst other things, laying off employees, was reversed, the Appellate Division stating: "It is our view that the motion for a preliminary injunction must be denied, as plaintiffs have not made out a clear right to the relief demanded * * * Further, plaintiffs have not demonstrated that they will be irreparably harmed in the event the preliminary injunction is not granted * * * The State, in its brief, has conceded that plaintiffs will be entitled to reinstatement and back pay in the event they ultimately prevail."

Bearing in mind the rules above discussed, we come now to the issues between these parties. The plaintiffs argue, amongst other things, that, because this case involves a collective bargaining agreement, it stands in a different position before the law than would a case which deals with nonlabor agreements and that the courts have "historically and consistently" applied a different standard. In support of this proposition the plaintiffs have cited five cases, all of which have been examined and will be taken up seriatim.

We start with *Schlesinger v Quinto* (201 App Div 487), and we note that the case involved a violation of a collective bargaining agreement in that the employers therein attempted to change the payment of wages, to the members of the union, from the week-work system to the piece-work system. Under the circumstances the court properly approved the granting of an injunction *pendente lite* to the union. The court specifically found that the excuse offered by the employer was no justification for breaching its contract, saying (p 499): "Is *[sic]* is urged that, by reason of changes in the expense of living and the condition of unemployment, the terms have become onerous, and the expense of production makes the business unprofitable to the manufacturer. This excuse for the non-performance of a contract has within the last few years been frequently presented to the courts, but has never been accepted. Unless the parties have stipulated, in terms, for relief because of changed conditions, they must perform their contract as it is written." It must be remembered that this was a collective bargaining agreement between the International Ladies' Garment Workers' Union, which, at that time (1922), had a membership of about 150,000 in all

parts of the United States, and the Cloak, Suit and Skirt Manufacturers' Protective Association, an association of employers. Surely the case at bar is in no way comparable to this last-cited case. It would be a fine state of affairs if a party to a collective bargaining agreement could breach it at will, simply because its profits were insufficient.

We next consider *Goldman v Cohen* (222 App Div 631). The situation before the court in this cited case involved a threatened lockout and the opening of a nonunion shop, in violation of a contract between the parties whereby the defendants had agreed to hire union labor, to be supplied by the plaintiff, and not to order a lockout pending the determination of any grievances. Of course, an injunction *pendente lite* was quite proper. It is interesting to note the language of the court, at page 634 of its opinion: "It is not every breach of a contract which a court of equity will enjoin. Only in so far as it is shown that the particular breach has been threatened and that the remedy at law is inadequate and the damages irreparable, will a court of equity intervene."

In *Murphy v Ralph* (165 Misc 335), the court dealt with a situation where the defendants repudiated the agreement by employing nonunion men, in violation of the contract. Again, a different situation than that presented in the case at bar.

In *Ribner v Racso Butter & Egg Co.* (135 Misc 616), again the court dealt with a situation involving a contract between the parties under which the defendant had agreed to exclusively employ union men, in good standing, and to immediately discharge any person who had ceased to be a member of the union. The defendant, in violation of the agreement, did not deny that he employed persons not members of the plaintiff union and the court properly held that an injunction *pendente lite* was the only adequate remedy in the case, because plaintiff's injury was a continuous one and irreparable. Surely not the situation presented in the case at bar.

Finally, the defendants cite *Suttin v Unity Button Works* (144 Misc 784). In that case the situation presented was that of an employer discharging members of the union and hiring others who were not union members, in violation of the contract. The court said (p 785): "When the harm resulting from illegal conduct is continuous and involves more than loss of money, equity may step in and restrain the continuing perpetration of wrong." The court then properly granted an injunction *pendente lite.*

We believe it is fair to conclude, after an examination of the authorities cited by the plaintiffs, that the cases relied upon by them present completely different factual situations than that presented in the instant case and they cannot be relied upon as providing legal authority to justify the continuance of the temporary injunction granted at Special Term. The fact is that the plaintiffs have failed to call to this court's attention any precedent which presents a factual situation similar to the facts presented in the case at bar, or anywhere near it. However, this is understandable, because our own independent research has failed to come up with any such case.

The truth is that there are so many issues of fact in the case which must be determined before the final rights and obligations under the contract in question can be determined, that it is difficult to understand the contention of the plaintiffs that they have demonstrated a clear legal right to the relief sought. Nor have they demonstrated that they will be irreparably harmed if such relief is denied them. We agree with the position of the defendants that, in the event that plaintiffs succeed at the trial, then, of course, they will recover back pay and reinstatement to their positions, with all the rights and privileges restored to them. Hence, where is the irreparable damage?

At the very outset the meaning of section 1 of article III of the contract involved, which is entitled "SALARIES", must be determined. The language is as follows: "The City agrees to employ each of the employees for the period between July 1, 1974 and June 30, 1976 for 261 (8 hour) working days per annum at the respective annual compensation set forth in Schedule "A" of this Article III."

The plaintiffs contend that this language is in the nature of a guarantee of job security for the time expressed. As against this contention the affidavit of William W. Hediger, the Deputy Director of the Office of Labor Relations of the City of New York, discloses that he, with others, represented the City of New York in its negotiations with the plaintiff union, which resulted in the execution of the collective bargaining agreement upon which this lawsuit is based. Mr. Hediger asserts that at no time was the topic of job security ever discussed during these negotiations and it is important to note that there is no denial of this statement by the plaintiffs.

The plaintiffs contend that they gave up their rights under section 220 of the Labor Law in the belief that they had been

given guaranteed employment. This is emphatically denied by the defendants and they indicate that the only reason why this particular provision of the agreement was agreed upon is because, trying to determine the prevailing wage rate under section 220 was often a difficult undertaking and, by acceding to this clause in the agreement, the employees represented by plaintiffs were assured of a fixed salary during their employment. Of course, we cannot determine where the truth lies. This is one of the issues which must be determined after a trial.

Also to be considered is the effect, if any, of subdivision b of section 1173-4.3 of the Administrative Code of the City of New York, on the respective positions assumed by the parties to this litigation. That section reads, in part, as follows: "Scope of collective bargaining; management rights * * * (b) It is the right of the city * * * to determine the standards of services to be offered by its agencies * * * relieve its employees from duty because of lack of work or for other legitimate reasons * * * determine the methods, means and personnel by which government operations are to be conducted * * * take all necessary actions to carry out its mission in emergencies * * * Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining".

The defendants emphasize the language concerning the city's right to "relieve its employees from duty because of lack of work *or for other legitimate reasons*". (Emphasis added.) They argue that, if the agreement is read, as is urged by the plaintiffs, as one guaranteeing a definite period of employment, then it would be violative of the quoted portion of the Administrative Code, and, further, that it would deprive the city of its right to take positive action when faced with a budget crisis. Again, we merely point out that this presents another open question on which we make no judgment, as it should be left for the trial court, to be determined on the basis of all the facts developed at the trial.

In the face of the above-quoted portion of the Administrative Code, the defendants urge a further argument to the effect that, if it were determined that the parties had entered into an agreement whereby the plaintiffs were assured of employment for a period of two years, irrespective of the financial reverses which the city might suffer, that such an agreement would violate public policy. Of course, we do not pass judgment at this time on this issue, except to note that

no definite determination can be reached until the facts are clearly established. However, we must call attention to some of the cases which have considered this subject and which again point to the fact that one cannot say, on the record before the court, that the plaintiffs have established a clear legal right to the relief which they seek.

In *Matter of Schwab v Bowen* (80 Misc 2d 763), the court held that the petitioners, whose positions were being abolished by respondent city solely for economic reasons, had been lawfully discharged. The court said (pp 765, 766):

"It is axiomatic that an appointing official has the power to abolish a civil service position when acting in good faith [citing case]. Consequently, the public employer cannot surrender the power to abolish positions in good faith through the vehicle of a collective bargaining agreement * * *

"Indeed, the court is of the view that it would be highly improper to permit municipal officers to commit a municipality to the continuance of a particular number of employees for a multiyear period despite the economic condition of said municipality."

In *Atlantic Beach Prop. Owners' Assn. v Hempstead* (3 NY2d 434, 438), we find the following language which is particularly pertinent to the case at bar: "Agreements by which the public powers of a municipality are surrendered without express permission of the Legislature are beyond the powers of the municipality and void [citing cases]."

In *Matter of Young v Board of Educ. of Cent. School Dist. No. 6, Town of Huntington* (35 NY2d 31), it was held that the respondent Board of Education had the power to abolish the position of attendance teacher held by petitioner, who had tenure, and to divide the duties among principals and assistant principals in the district. In this cited case, Judge JASEN, writing for a unanimous court, said (p 34): "Faced with spiraling operating costs and ever increasing demands on their tax bases, school districts must have sufficient latitude within the law to manage their affairs efficiently and effectively. This implies, where appropriate, the power to consolidate and abolish positions for economic reasons."

In the *Matter of Lippmann v Delaney* (48 AD2d 913) a decision by the Appellate Division, Second Department, it was held that the petitioner, who had been notified that his position was abolished, was not entitled to reinstatement on the theory that his dismissal was in violation of an employment contract

entered into between the Westchester County Civil Service Employees Association, Inc., and Westchester County. In its memorandum decision the court said (p 914): "A person appointed in accordance with the provisions of the Civil Service Law does not have such permanency of tenure that his position must be continued and appropriation made for payment of the salary originally attached to the position [citing cases]. It is axiomatic that an appointing official has the power to abolish a civil service position when acting in good faith, and, in the absence of fraud or corruption * * * A public employer does not surrender the power to abolish positions in good faith, through the vehicle of a collective bargaining agreement, unless the subject of the abolition of position constitutes a term or condition of employment."

We have taken note of the arguments advanced by the plaintiffs attacking the propriety of the city keeping provisionals on the payroll, to the detriment of these plaintiffs. The city calls attention to the fact that there are no provisionals working as sanitationmen and plaintiffs have not denied this statement. In any event, what effect, if any, the hiring of provisionals by the city, who are working in other departments, may have on the rights of these plaintiffs can only be explored at a trial. This is simply an issue of fact to be resolved.

The plaintiffs argue further that, in a prior case, *Kunz v City of New York* (286 App Div 252, affd 3 NY2d 834), the city stated in its brief that an analogous provision, relating to the wages to be paid during a specific period, was a guarantee of employment. This, however, is answered by the city calling attention to other portions of that brief where the city claims that there is an explanation of the alleged concession. In any event, we are not concerned with a statement made in a brief in some other case. It has no relevance insofar as our determination of the case at bar is concerned. We are duty bound to base our decision only upon the record now before us.

Our dissenting colleagues frankly concede that there are a number of issues of fact which must be determined and join the court in directing an early trial of the "colorable claims" of the plaintiffs.

We should like to note, too, the candid concession by the plaintiffs of "the obvious fact that the city is experiencing economic difficulties".

In conclusion, we find that the granting of the temporary injunction by Special Term was an improvident exercise of discretion. Because of the issues of fact presented by this record the plaintiffs have simply been unable to demonstrate that they have a clear legal right to such an extraordinary remedy. We also believe that they have failed to demonstrate irreparable damage to them by a denial of this remedy because we find that, if, at the trial of the issues, the plaintiffs shall have succeeded in holding the defendants liable for breach of the contract, they can be fully compensated by the payment of back salaries and a restoration of their old positions as of the date of the illegal discharge.

We also desire to make clear that we have not passed upon the merits of this litigation, as we believe all the questions presented are matters for the trial court to explore on the basis of the proofs offered and only when the facts are established can the law be applied.

Recognizing the exigencies of the situation in this litigation and the parties having indicated that they are ready to proceed to trial, it is directed that a trial of the issues proceed at the earliest possible time.

Accordingly, the order appealed from should be reversed on the law and on the facts, and the motion denied, without costs.

MURPHY, J. (dissenting). We disagree and vote to continue the temporary injunction granted below in order to maintain the status quo pending the trial which we all agree should be promptly held.

In or about July, 1974, the city and the Uniformed Sanitationmen's Association, Local 831, I.B.T. ("the Union"), entered into a two-year collective bargaining agreement which provides, *inter alia:*

"The terms 'employee' and 'employees' as used in this agreement shall mean, except as otherwise used in Article III, Section 3(e) and 3(g)2, only those persons in the unit described in Section I of this Article who were and still are employed by the City under the title Sanitationman on the date of the signing of the Waiver and Release required by Article VII of this Agreement." (Art. I, § 2.)

"The City agrees to employ each of the employees for the period between July 1, 1974 and June 30, 1976 for 261 (8 hour) working days per annum at the respective annual

compensation set forth in Schedule 'A' of this Article III." (Art. III, § 1.)

"It is specifically understood and agreed that the terms and provisions of this Agreement and the benefits granted thereunder shall be applicable as of July 1, 1974 (the effective date of this Agreement) to each employee who was and still is employed by the City in the title Sanitationman on the date of signing of the Waiver and Release required by Article VI of this Agreement and who executes the following instruments and complies with the provisions of such instruments:

"(a) A waiver of any rights such employee may have under section 220 of the Labor Law in a form and manner approved by the Corporation Counsel's Office for such purpose * * * and;

"(b) A Release to the City of New York in the form now used by the City for such purpose". (Art. VI.)

As we indicated in our dissenting opinions on plaintiff's motion to vacate the city's statutory stay *(DeLury v City of New York,* 48 AD2d 405) the principal contractual provision here in issue is unique; and has no counterpart in other current labor agreements with any sizeable group of municipal employees. Nevertheless, and despite such provision, the city announced its intention to (and actually did, after the temporary injunction granted below was stayed) discontinue the services of several thousand sanitationmen to effectuate allegedly necessary economies. Respondents immediately sought injunctive relief. Cf. *Kunz v City of New York,* 286 App Div 252, affd 3 NY2d 834, where, ironically, the city took the same position it now vigorously opposes—i.e., that guaranteed employment at a fixed rate was proffered in exchange for a waiver of prevailing rate claims.)

Plaintiffs contend that a guaranteed employment provision was inserted in the collective bargaining agreement, at the city's insistence, to avoid disputes and uncertainties which frequently arose in the past by reason of the need to apply section 220 *et seq.* of the Labor Law to certain covered employees, including sanitationmen. Simply stated, said sections require certain public employees to be paid not less than the "prevailing rate of wages" paid to those similarly engaged in the same locality. A contract for future services conditioned on waiver of such Labor Law right has heretofore been held valid. *(Evadan Realty Corp. v Patterson,* 192 Misc 850, affd 276 App Div 751.)

The city, on the other hand, denies any intention to provide job security for the members of the Union in the current agreement, despite the seemingly unambiguous language used; and further contends that even if the agreement could be so construed, such provision would violate both the law and public policy. We disagree.

Subdivision b of section 1173-4.3 of the Administrative Code of the City of New York, heavily relied on by appellants, provides, in pertinent part, that "[i]t is the right of the city * * * to * * * relieve its employees from duty because of lack of work or for other legitimate reasons [and to] * * * take all necessary actions to carry out its mission in emergencies * * * Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining".

Initially, a serious question is presented as to whether the city, operating on a 12 billion dollar budget, can fire several thousand civil servants while it continues to employ thousands of provisional and temporary employees, none of whom has civil service tenure, let alone any arguable contractual undertaking of employment. (Cf. *Matter of Danker v Department of Health of City of N. Y.,* 153 Misc 502, affd 242 App Div 765, affd 266 NY 365.)

But even assuming, *arguendo,* as the city contends, that lack of funds is the statutory equivalent of "lack of work" (since a municipality, unlike a manufacturer awaiting orders, never lacks work), we do not read the aforesaid provision of the Administrative Code as prohibiting, either explicitly or by plain and clear language, an agreement providing for secure employment for a specified term. (Cf. *Syracuse Teachers Assn. v Board of Educ., Syracuse City School Dist.,* 35 NY2d 743; *Board of Educ. Union Free School Dist. No. 3, Town of Huntington v Associated Teachers of Huntington,* 30 NY2d 122.) At most, subdivision b of section 1173-4.3 of the Administrative Code permits the city to refuse to bargain on a term agreement without fear of incurring sanctions for the commission of an improper practice.

Moreover, article 14 of the Civil Service Law (the so-called "Taylor Law"), which assertedly supersedes the collective bargaining provisions of the Administrative Code with respect to contracts negotiated by the city after March 1, 1973 (Civil Service Law, § 205, subd 5, par [d]), contains no provision proscribing term agreements. (See Civil Service Law, § 201,

subd 12; *Town of Kent Police Benevolent Assn. v Town of Kent,* 42 AD2d 747; *Matter of Reese v Lombard,* 47 AD2d 327.)

In short, we find nothing in the governing statutes or in the public policy of this State precluding the city from waiving its right to refuse to bargain for a term contract providing job security in exchange for the sanitationmen's waiver of their right to refuse to bargain away their section 220 of the Labor Law rights. The respective rights of each side involve permissible, as distinguished from mandatory or prohibited, items of bargaining.

Finding then, as we do, that a colorable claim has been presented that the city entered into a term agreement with plaintiffs, as it is lawfully permitted to do, the sole question presented on this appeal is whether Special Term abused its discretion in directing that the status quo be maintained until the conclusion of the trial, which we all agree should be expeditiously held. In our view, it did not.

Historically, the courts of this State have applied a less stringent standard than normally prevails in granting *pendente lite* relief in cases involving disputes under collective bargaining agreements. (See, e.g., *Goldman v Cohen,* 222 App Div 631; *Schlesinger v Quinto,* 201 App Div 487; *Suttin v Button & Novelty Workers,* 144 Misc 784, affd 236 App Div 792.) The rationale for such distinction was succinctly stated by Judge FINCH in *Goldman (supra,* p 633): "Whether the union may collect damages on behalf of the employees and what is the true measure of the damage to the union, it is not necessary to decide since, for the purposes of this decision, it is certain that the union has more at stake to preserve under this contract than the sum of the damages occasioned by the unlawful discharge of all of the members of the union, assuming that such damages may be recovered by the union. If the union has not the right to invoke the aid of a court of equity to prevent the unlawful violation of a contract such as exists in the case at bar, then such a contract loses most of its force and the rights of collective bargaining are narrowed, and the economic benefits to the community from collective bargaining to a great extent lost."

The city, like any private employer, is obliged to honor its lawful obligations. *(Walla Walla v Walla Walla Water Co.,* 172 US 1; *Dawson v Columbia Trust Co.,* 197 US 178; *Greenberg v City of New York,* 152 Misc 488.) To require less would

seriously undermine the salutary purpose of the Taylor Law "to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government." (Civil Service Law, § 200.)

In such connection, we have no desire to second guess, or usurp the functions of, any other branch of government in the budgetary process; or to prejudge the merits of this case. Nor is it our intention to underestimate or minimize the serious financial problems facing the city, or to criticize the gargantuan efforts being made to resolve them. And in reaching our decision, we have refrained from spelling out the serious consequences to these city employees who were laid off because of economic conditions and fiscal practices beyond their control, since there are thousands of others similarly situated.

In sum, all we urge holding today is that, in the circumstances here presented, the arguably meritorious claim of plaintiffs deserves closer judicial scrutiny before substantial benefits derived by several thousand sanitationmen dependent on their continued employment are severely prejudiced, if not irretrievably lost. Any resulting damage to the city occasioned by continuation of the injunction *pendente lite* may be offset by the $1,000,000 undertaking posted by respondents.

But before concluding, we also deem it appropriate to recall the ancient maxim that he who comes into equity must come with clean hands. Accordingly, on the trial, if such issue is appropriately raised, the court may also inquire as to whether the actions of plaintiffs, or any of them, following the challenged layoffs, violated the contract sued upon and the Taylor Law.

In light of the foregoing, the order appealed from should be affirmed and an immediate trial directed to resolve the closely contested issue of the parties' true intent in executing the two-year agreement here in issue.

STEVENS, P. J., CAPOZZOLI and NUNEZ, JJ., concur in *Per Curiam* opinion; KUPFERMAN and MURPHY, JJ., dissent in opinion by MURPHY, J.

Order, Supreme Court, New York County, entered on June 27, 1975, reversed, on the law and on the facts, and the motion denied, without costs and without disbursements.